# Illinois Official Reports

## Appellate Court

---

### *People v. Shakirov*, 2017 IL App (4th) 140578

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MANSUR SHAKIROV, Defendant-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-14-0578 |
| Filed | April 5, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 13-CF-597; the Hon. John Casey Costigan, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Michael J. Pelletier, Jacqueline L. Bullard, and Daaron V. Kimmel, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Jason Chambers, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and John M. Zimmerman, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion.<br>Justices Holder White and Pope concurred in the judgment and opinion. |

**OPINION**

¶ 1 In March 2013, defendant, Mansur Shakirov, was driving a semi-tractor trailer southbound on Interstate 39 (I-39) near Hudson, Illinois, when he collided with several emergency vehicles that were responding to an earlier accident. The collision resulted in the death of volunteer firefighter Christopher R. Brown.

¶ 2 In May 2013, the State charged defendant with reckless homicide (720 ILCS 5/9-3(a) (West 2012)). In March 2014, a jury convicted defendant of that charge, and the trial court later sentenced him to four years in prison.

¶ 3 Defendant appeals, arguing, in pertinent part, that the State failed to prove him guilty beyond a reasonable doubt. Defendant argues alternatively that the trial court erred by denying his motion *in limine* to bar certain evidence. For the reasons that follow, we reverse.

¶ 4                                       I. BACKGROUND
¶ 5                            A. The Charge of Reckless Homicide
¶ 6 To facilitate the reader's understanding, we provide the elements the State was required to prove beyond a reasonable doubt to sustain a conviction for reckless homicide.

¶ 7 A person commits reckless homicide when (1) while driving a motor vehicle, (2) the person "unintentionally kills an individual without lawful justification *** if his acts whether lawful or unlawful *** are such as are likely to cause death or great bodily harm," and (3) those acts were performed recklessly. 720 ILCS 5/9-3(a) (West 2012). As applied to the offense of reckless homicide, "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that [his acts are likely to cause death or great bodily harm], and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2012); see also 720 ILCS 5/9-3(a) (West 2012).

¶ 8                      B. The State's Charge and Defendant's Arraignment
¶ 9 On the evening of March 5, 2013, defendant, a 28-year-old resident of Spokane, Washington, was driving a semi-tractor trailer southbound on I-39 near Hudson, Illinois, when he collided with emergency vehicles that were parked in the left lane responding to an earlier accident. Defendant's collision resulted in Brown's death. Police issued defendant two traffic citations that night, and sometime later, defendant returned to Spokane.

¶ 10 In May 2013, the State charged defendant with reckless homicide, alleging, as follows:

> "[T]hat defendant, while acting in a reckless manner, performed acts likely to cause the death of or great bodily harm to some individual in that he operated a motor vehicle, a white 2003 Freightliner [semi-tractor trailer], in a southern direction [o]n the inside (left passing lane) of I-39, *** at a speed which was greater than was reasonable and proper with regard to the existing traffic conditions and the safety of persons properly upon the roadway, failed to proceed with the necessary due caution and yield the right-of-way by slowing down and change [*sic*] into the right lane, while reducing speed of the vehicle and maintaining a safe speed for the conditions, upon approaching authorized emergency vehicles displaying the appropriate warning lights, in that the defendant caused his vehicle to strike *** Brown, thereby causing [his] death[.]"

That same day, the trial court issued a warrant for defendant's arrest. The United States Marshals Service subsequently arrested defendant in Spokane.

¶ 11    At a July 3, 2013, arraignment hearing, defendant appeared with counsel. At that hearing, defendant (1) filed a waiver of extradition, (2) surrendered his passport, (3) agreed not to drive commercial vehicles, and (4) entered a plea of not guilty. Upon the parties' agreement, the trial court set defendant's bail at $100,000. That same day, defendant posted a $10,000 cash bond and was released from custody.

¶ 12                          C. Defendant's Motion *in Limine*

¶ 13    On March 7, 2014, defendant filed a motion *in limine*, seeking to bar the State from introducing evidence regarding an alleged violation of (1) section 395.3 of title 49 of the Code of Federal Regulations (Federal Regulation) (49 C.F.R. § 395.3(a)(1), (2), (3)(i) (2013)), which is a Federal Motor Carrier Safety Administration regulation titled "Maximum driving time for property-carrying vehicles," and (2) section 11-907 of the Illinois Vehicle Code (625 ILCS 5/11-907 (West 2012)), titled "Operation of vehicles *** on approach of authorized emergency vehicles." As to each of these allegations, defendant contended that such evidence was not relevant, had no probative value, and would be highly prejudicial.

¶ 14          1. *The Pertinent Portions of the Provisions at Issue and the*
                  *Specific Evidence Defendant Challenged*

¶ 15    To provide context, we quote the pertinent provisions of the aforementioned sections of the Federal Regulation and Vehicle Code and provide a brief discussion of the specific evidence defendant sought to bar the State from presenting to the jury.

¶ 16                      a. Section 395.3 of the Federal Regulation

¶ 17    The pertinent provisions of section 395.3 of the Federal Regulation provide as follows:

"(a) *** [N]o motor carrier shall permit or require any driver used by it to drive a property-carrying commercial motor vehicle, nor shall any such driver drive a property-carrying commercial motor vehicle, regardless of the number of motor carriers using the driver's services, unless the driver complies with the following requirements:

(1) *Start of work shift*. A driver may not drive without first taking 10 consecutive hours off duty;

(2) *14-hour period*. A driver may drive only during a period of 14 consecutive hours after coming on duty following 10 consecutive hours off duty. The driver may not drive after the end of the 14-consecutive-hour period without first taking 10 consecutive hours off duty."

(3) *Driving time and rest breaks*. (i) *Driving time*. A driver may drive a total of 11 hours during the 14-hour period specified in paragraph (a)(2) ***." 49 C.F.R. § 395.3(a)(1)-(3)(i) (2013).

¶ 18                      b. Section 11-907 of the Vehicle Code

¶ 19    Section 11-907(c)(1), (2) of the Vehicle Code—commonly referred to as "Scott's Law"—provides as follows:

"(c) Upon approaching a stationary authorized emergency vehicle, when the authorized emergency vehicle is giving a signal by displaying alternately flashing red, red and white, blue, or red and blue lights or amber or yellow warning lights, a person who drives an approaching vehicle shall:

(1) proceeding with due caution, yield the right-of-way by making a lane change into a lane not adjacent to that of the authorized emergency vehicle, if possible with due regard to safety and traffic conditions, if on a highway having at least 4 lanes with not less than 2 lanes proceeding in the same direction as the approaching vehicle; or

(2) proceeding with due caution, reduce the speed of the vehicle, maintaining a safe speed for road conditions, if changing lanes would be impossible or unsafe." 625 ILCS 5/11-907(c)(1), (2) (West 2012).

¶ 20                    c. The Specific Evidence Defendant Sought To Bar

¶ 21    Defendant sought to prevent the State from soliciting expert testimony that on the day before Brown's March 5, 2013, death, defendant violated section 395.3(a)(2) of the Federal Regulation by driving after the aforementioned 14-hour time period had elapsed. The expert based his opinions, in part, on defendant's logbook entries, in which he was required to document, among other matters, the time he spent driving. As to the Vehicle Code, defendant sought to prevent the State from offering expert testimony that he violated Scott's Law by failing to reduce speed or change lanes when approaching the emergency vehicles at issue.

¶ 22                    2. *The Hearing on Defendant's Motion* in Limine

¶ 23    On March 10, 2014, defendant's trial commenced. After the parties had selected a jury and the trial court released the jury for the evening, the court considered arguments on defendant's motion *in limine* and ruled as follows:

"[T]he court understands the experts' reports to indicate that there was a Scott's Law violation, that *** speed was an issue with regard to the conditions ***. *** [The court has] not seen the expert reports *** but the court does think that the expert witnesses[,] if properly disclosed[,] can come to the conclusion that here [are] the facts, here is my [expert] opinion on it[,] and here [are] the facts that support it. So [the court will] allow him or her to testify as to what the conclusions are in the report if that is what the report indicates.

With regard to the log book violation, this court will take an offer of proof on [that issue,] but *** [the court is] having a difficult time seeing where the log book violation *that occurred a day before the accident* is going to have relevance to the day of the accident itself. So at this point in time, until that offer of proof is made so the court can see it, the court is going to exclude it." (Emphasis added.)

¶ 24                    D. Defendant's Jury Trial
¶ 25                    1. *The Initial Accident*
¶ 26    Illinois State Police trooper Christopher Parmley testified that at 9:40 p.m. on March 5, 2013, he received a call about an accident that had occurred in the southbound lanes of I-39 at mile marker 6. (At mile marker 6, I-39 is comprised of two northbound lanes and two

- 4 -

southbound lanes separated by a substantial grassy median.) Parmley's initial investigation revealed that a pickup truck towing a trailer of auto parts had been traveling northbound on I-39 when the driver lost control because the trailer started "fishtailing." The trailer's side-to-side movement caused the pickup truck to travel through the median into the southbound lanes, where a semi-trailer truck (semi) struck the back of the pickup truck and dislodged the trailer. As a result of the collision, the semi traveled into the median, where it stopped. The trailer also traveled into the median but landed on its side. (Later testimony revealed that the rear of the trailer protruded into the southbound left lane of I-39.) The pickup truck came to rest on its side facing north on the southbound right shoulder of I-39.

¶ 27          2. *The Evidence Presented Concerning the Collision at Issue*

¶ 28          Dan Hite, chief of the Hudson community fire protection district, testified that on the evening of March 5, 2013, he received a call at his home regarding an accident that had occurred in the southbound lanes of I-39 at mile marker 6. Hite traveled to that location in a sport utility vehicle (SUV) equipped with emergency lights on the front dash and rear window. Hite described the weather conditions as "light snow, blowing, fairly heavy winds, [and] cold." Hite entered I-39 a mile south of mile marker 6 and drove north with his emergency lights activated. Hite noted that the road was "slick," with snow "blowing across [I-39]," but "visibility was not obscured." Hite stated that he traveled on I-39 "at a safe but moderate speed," which he estimated was "between 35 to 40" miles per hour. After traveling one-half mile, Hite saw (1) the silhouette of a semi, (2) a pickup truck located on the right southbound shoulder, and (3) that both vehicles had their hazard lights activated.

¶ 29          Hite—who was the first emergency responder at the accident site—passed the semi, which was located in the median. Hite continued north and passed a trailer lying on its side that the pickup truck had been towing. The trailer was also located in the grassy median, approximately 50 feet north of the semi. Hite parked his SUV on the northbound left shoulder of I-39, approximately 100 feet north of the semi and 50 feet north of the trailer. Hite then assumed command of the accident site.

¶ 30          Hite provided the following locations of the emergency vehicles that arrived shortly thereafter: (1) an ambulance was parked facing south in the grassy median next to the semi; (2) fire engine 102 was parked in the left southbound lane of I-39 adjacent to the trailer; and (3) a squad car that Parmley had parked behind engine 102 but on the left shoulder instead of the left lane, where engine 102 was parked. All emergency vehicles had their entire complement of emergency lighting activated, including a light bar at the rear of engine 102 that had eight lights sequentially blinking from left to right. The blinking lights alerted drivers to remain or move into the right lane.

¶ 31          Hite confirmed that another emergency vehicle, fire command SUV 105, arrived later. Hite explained that because he was concerned about oncoming southbound motorists, he ordered the four firefighters that were en route in SUV 105 to a position sufficiently north of the accident so that they could alert southbound traffic to reduce speed and move into the right lane. Hite stated that SUV 105 was subsequently positioned north "about a half mile, right next to the turnaround." Hite observed that the speed of the light traffic that thereafter approached the accident site "was slowing as it approached from both directions." Sometime prior to making final preparations to leave the accident site, Hite recalled SUV 105. SUV 105 returned and parked behind engine 102 in the left southbound lanes of I-39. Hite noted that the front end

of SUV 105 was parallel to the rear end of Parmley's squad car, which remained parked on the left shoulder.

¶ 32   Prior to his departure, Hite stood at the rear of engine 102 and in front of the squad car and SUV 105 with his command staff, comprised of Assistant Chief Jeff Thomas, Captain Steve Modine, and Lieutenant Jason Brutlag. At some point, Thomas—who was monitoring oncoming traffic—yelled, "[H]e's not stopping. He's not stopping. Run." Hite looked up and observed what he characterized as "the largest semi I've ever seen in my life" approaching their location. Hite began running and heard "tearing metal," two loud booms, and "then it was eerily *** quiet." (We note that immediately prior to the defendant's collision with SUV 105, a recording taken from the vantage point of Parmley's squad car shows four firefighters standing on the east side of engine 102 near the front of the engine's passenger compartment before they begin running.) Hite looked up and noted the dark conditions because the only remaining emergency lighting came from his SUV. Hite immediately inquired about the whereabouts of his firefighters. No one could find Brown. Hite confirmed that just prior to the second accident, the road conditions remained slick and snow continued to blow across I-39.

¶ 33   Thomas testified that he and five other firefighters arrived at mile marker 6 in engine 102. Thomas, who sat in the front passenger seat, told the driver, volunteer firefighter Robert Dicken, to enter the highway two miles north of the accident site. While on an I-39 overpass, Thomas stated that he could see the ambulance and Hite's SUV. Thomas estimated visibility at three to four miles and described the conditions on I-39 as "a little bit snow packed in the passing lane, clean in the driving lane, [and] a little bit of cross wind." Thomas added that "[i]t was more blowing than snowing," in that the existing snow was primarily caused by the wind "picking up the snow off the fields" instead of naturally occurring snowfall. Dicken testified that the road conditions were "spotty but not snow covered" and he was able to drive at a "fairly decent speed" on I-39, which he estimated was "close to 40 [to] 45 mile[s] per hour."

¶ 34   As they traveled to the accident site, Thomas conferred with Hite by radio and directed Dicken to travel in the left southbound lane to execute "a block." Thomas explained that because Hite informed him that the semi and trailer were located in the median, he wanted to position engine 102 to block the southbound left lane and force traffic into the southbound right lane and away from the two emergency medical technicians working in the median. Thomas also noted that the end of the trailer was "hanging out into the [left] lane a little bit," which further necessitated the blocking of that lane. After Dicken executed the block, Thomas exited the vehicle and ordered the firefighters to stay in the engine's cab. Thomas then conferred with Hite.

¶ 35   Just prior to leaving the accident site, Thomas had been standing in the median near engine 102 observing southbound traffic for about 40 minutes, which was one of his responsibilities. Thomas stated that southbound traffic was reacting to the emergency lighting by slowing down and moving over into the right lane. Thomas confirmed Hite's account of the positioning of the squad car and SUV 105 in relation to engine 102, and Thomas noted all had their respective emergency lights activated. As he was waiting to leave, Thomas saw the lights of an approaching vehicle, which he estimated was 1½ miles away. At that moment, Thomas did not know which lane the vehicle was in or the type of vehicle that approached. No other vehicle lights appeared in the southbound lanes at that moment. About a mile away, Thomas recognized that the approaching vehicle was a semi.

- 6 -

¶ 36     When the semi was about one-half mile away, Thomas became concerned because the semi (1) remained in the left southbound lane, (2) did not signal its intent to move into the right southbound lane, and (3) did not provide any indication that it was slowing its approach. As defendant's semi approached, Thomas came to the "realization that this [semi] wasn't slowing down" because he did not hear screeching or squealing tires, or see any illuminated turn signal or four-way hazard lights. When Thomas determined that a collision was certain to occur, he yelled out to his fellow firefighters that the driver was not going to stop and urged them to run. As he fled, Thomas saw and heard the semi impact SUV 105. Thereafter, Thomas heard three more distinctive "pops" that he surmised were (1) the semi colliding into the rear of the squad car, (2) the front of SUV 105 colliding with the rear of engine 102, and (3) the semi colliding with the rear of engine 102. Thomas then heard someone over his radio calling for the status of firefighting personnel. As Thomas began the process of extricating two firefighters who were trapped in SUV 105, Hite informed Thomas that he had found Brown. Thomas estimated that Brown was lying on I-39 about 60 to 70 feet from where he had been standing monitoring southbound traffic.

¶ 37     Volunteer firefighter Tyler Scott Cobler testified that he traveled to the accident site in SUV 105, along with Modine and volunteer firefighters Ben Smith and Brown. Smith drove and received orders from Modine, who was seated in the front passenger seat. Cobler sat behind Modine, and Brown sat behind Smith. Cobler traveled to the accident site using the same route as engine 102. After entering the southbound lanes of I-39, SUV 105 stopped at a turnaround, which Cobler confirmed was a mile north of the accident site. From that location, Cobler saw the emergency lighting at the accident site. Cobler exited SUV 105 and for about the next 30 to 45 minutes, he performed duties consistent with alerting southbound traffic to slow down. Cobler observed that southbound traffic was slowing down and moving into the right lane as a result of their efforts. Cobler confirmed that after returning to their initial seating positions, SUV 105 left the turnaround, proceeded to the accident site, and parked in the left southbound lane. Cobler noted that a squad car was parked to the left of SUV 105.

¶ 38     Smith, Modine, and Brown exited SUV 105. Cobler remained seated behind the front passenger seat. Sometime thereafter, Smith returned to SUV 105. Cobler then recalled looking over his left shoulder and seeing a truck approaching. Cobler then heard "some commotion," "people yelling outside," and Smith looking in the rear view mirror "as if something was coming." Cobler provided the following account regarding Brown's attempt to reenter SUV 105: "[Brown] attempted to get in. It appears that [Brown] thought that he could try to outrun [the semi] and then at that point he slammed the door and that was the last that I saw of him." Immediately prior to the impact, Cobler did not hear any screeching or squealing that would indicate the semi was braking. Cobler braced for the impact. After feeling as if he went airborne, SUV 105 hit engine 102 and "just exploded at that point." Afterward, Cobler attempted to exit SUV 105, but fellow firefighters told Cobler to stop moving.

¶ 39     Smith substantially corroborated Cobler's account of the events that occurred with regard to SUV 105, adding that (1) the road conditions on I-39 were "slick" and "[i]t was still snowing"; (2) he did not exceed "35 or 40 miles an hour" when traveling on I-39; (3) Parmley's squad car, engine 102, and SUV 105 all had sequential lighting flashing from left to right; and (4) defendant hit SUV 105 "a matter of minutes" after SUV 105 parked behind engine 102.

¶ 40      Testimony provided by the McLean county coroner revealed that the cause of Brown's death was "multiple blunt force injuries as a result of being struck by a semi."

¶ 41      *3. The State's Offer of Proof*

¶ 42      Outside the jury's presence, the State provided an offer of proof to address the trial court's concern regarding the relevancy of expert testimony that on the day before Brown's March 5, 2013, death, defendant violated section 395.3(a)(2) of the Federal Regulation by continuing to drive after a 14-hour time period had elapsed. The following testimony was provided by Charles Baird, an Illinois State Police trooper, who as part of his responsibilities as a commercial motor vehicle officer investigated accidents involving semis, which included investigating a driver's duty status records.

¶ 43      Drivers engaged in interstate commerce are required to maintain a record—referred to as a driver's log—as part of their licensing. Each log reflects the driver's activity within a 24-hour period. The categories a driver must record are comprised of the following four parts: (1) on duty, driving, (2) on duty, not driving, (3) sleeper berth, and (4) off duty. The on duty, driving category is self-explanatory and pertains to the time a driver spends driving. The on duty, not driving category pertains to employment duties that do not involve driving, such as vehicle loading or maintenance. The sleeper berth category records the time a driver spends exclusively within the sleeping compartment of the vehicle. The off-duty category records the time when a driver has "no responsibility for his truck or his [cargo]." Such off-duty time could include meals or showering at a rest stop. The 14-hour rule concerns the time a driver can spend on duty either driving or not driving during the 24-hour period each log records.

¶ 44      Defendant's driving log for March 4, 2013, documented that from 7:30 a.m. to 11:15 a.m. defendant entered an on-duty status—comprised of driving or not driving—and traveled approximately 218 miles (from Billings, Montana, to Glendive, Montana). Defendant then entered an off-duty status for 4½ hours (from 11:15 a.m. to 3:45 p.m.). At 3:45 p.m., defendant resumed his on-duty status and drove a total of approximately 429 miles, arriving in Barnesville, Minnesota, at midnight. During this 429-mile trip, defendant documented that he entered an "on duty, not driving" status on three separate occasions, with each occasion lasting 15 minutes. Because defendant began his day at 7:30 a.m., he was required to complete any on-duty responsibilities—either driving or not driving—by 9:30 p.m. to comply with the 14-hour rule. Defendant's self-documented on-duty activities, however, ceased at midnight, which represented a 2½-hour violation of the 14-hour rule.

¶ 45      Defendant's log for March 5, 2013, documented that (1) from midnight on March 5, 2013, to 10:30 a.m., defendant entered a sleeper-berth status and (2) from 10:30 a.m. to 1:45 p.m., defendant was off duty. Defendant then entered an on-duty status (driving or not driving) for the next seven hours, before colliding with SUV 105 at approximately 8:45 that evening. Baird agreed that on March 5, 2013, (1) defendant's "sleeper berth time [was] well within the regulations" and (2) defendant did not violate the rule against driving longer than 11 hours.

¶ 46      In response to the court's questioning, Baird confirmed that no citation was issued to defendant for the 14-hour rule violation because the violation was a past offense and not a current offense. Baird also confirmed that on March 5, 2013, defendant did not violate any aspect of section 395.3(a)(2) of the Federal Regulation.

¶ 47      Following argument, the trial court ruled that it would allow Baird's testimony regarding the 14-hour rule violation, reasoning as follows:

"The court *** did have a difficult time understanding, just based on arguments, where these alleged log book violations came in. *** The court does have a better understanding *** based upon the *** witness[es'] testimony who have testified ***. There have been several witnesses *** who had testified that [defendant's] vehicle did not slow or change lanes or take any evasive maneuvers prior to this accident occurring despite the fact that there [were] lights on the scene[.] [T]he fact that there [were] arrows indicating to move to the right lane as [defendant] was approaching the first accident scene and that was not done. That creates some thought in the court's mind as to what potentially was going on with regard to [defendant]; whether there was a lack of function; whether there was some sort of sleeping with regard to what was going on as he was approaching the accident scene and why the left lane was not yielded into the right lane ***. The court further understands that there can be a number of explanations for that. The court understands that the road was slick ***. The court *** [has] not heard [anything] regarding speed or anything of that nature at this point in time. So the court understands there could be a number of explanations. But one particular explanation could be ***, based upon what [the court has] heard ***, is that there is an inattentiveness to what was going on up ahead with regard to the accident scene. These log[-]book violations, the court understands there is no violation on the date in question. But there was this alleged, potentially diminuendoes [*sic*] violation that occurred within [24] hours of the accident occurring. And the court could see, from circumstantial evidence, where that may play a role in terms of this alleged potential circumstantial inattentiveness that was potentially happening while approaching the accident scene in between. This court understands that there could be other issues with regard to why the lane was not yielded. However, one possible explanation that the jury could consider would be an inattentiveness. ***

The court thinks that the alleged violations that did occur within the [24-]hour period would be relevant to that particular issue and would be probative for the jury to hear."

¶ 48                              4. *The Remaining Evidence Presented*

¶ 49        John Dittmer, an Illinois State Police master sergeant, testified as an expert in crash reconstruction and provided the following testimony.

¶ 50        Upon arriving at the accident site at 12:35 a.m. on March 6, 2013, Dittmer acknowledged that the weather conditions at mile marker 6 had changed from those that existed at the time of defendant's collision. Specifically, (1) the snow plows had "pretty much cleared up some of [I-39], (2) the amount of slush buildup on I-39 had been reduced, (3) "[t]he wind had subsided slightly," and (4) "the snow was coming down a lot lighter."

¶ 51        Dittmer used a linear momentum equation to estimate the minimum speed defendant's semi was traveling just prior to the initial collision with SUV 105, explaining that a basic law of physics provides that the energy introduced into a system must equal the energy used or dissipated by the system. Applying that rule, Dittmer explained further that the energy created by the momentum of defendant's semi just prior to the collision must equal the energy consumed by the vehicles that were damaged and displaced by that energy burst. The required variables involve determining the weight of each vehicle and the distances that they traveled as a result of the energy applied. A third required variable—the "coefficient of friction"—takes

into account the amount of resistance that a surface exerts on substances moving over it. To illustrate that concept, Dittmer explained further that if a person was wearing socks, he could slide over tile much more easily than sliding on a carpeted floor. Applying those variables, Dittmer calculated that at the moment of impact, defendant's semi was traveling at a minimum speed of at least 37.36 miles per hour.

¶ 52    Dittmer acknowledged that (1) semis are equipped with "event data recorders" that could provide speeds that are not dependant on calculations, (2) he had not received training on event data recorders, (3) he testified that the road conditions were icy but used a coefficient of friction for heavy snow to calculate defendant's minimum speed, (4) using a coefficient of friction for ice would have resulted in a five-mile-per-hour reduction in defendant's minimum speed, (5) he used an incorrect, lighter weight for defendant's semi, and (6) he based his conclusion that defendant did not brake on statements provided by the first responders.

¶ 53    Kevin Hoop, an Illinois State Police lieutenant, testified as an expert in crash reconstruction and provided the following testimony.

¶ 54    At 10:30 p.m. on March 5, 2013, Hoop was working as a shift commander when he heard a radio call indicating that a firefighter had been struck by a vehicle. Approximately 30 to 40 minutes later, Hoop arrived at the accident site and spoke to Parmley. After receiving an initial report and surveying the accident site, Hoop asked Dittmer to come to the scene to assist with the investigation. Thereafter, Hoop contacted defendant and acquired documentation, which included his license, registrations, proof of insurance, and his driver's log book. After consulting with Parmley and Brutlag and further surveying the accident site, Hoop issued defendant two citations for failing to (1) comply with Scott's Law and (2) reduce speed in hazardous conditions. Sometime later that night, Hoop spoke with defendant in his squad car, and defendant stated that he saw a truck in front of him and attempted to brake, but he could not stop his semi.

¶ 55    Hoop reviewed Dittmer's accident reconstruction report and acknowledged that in his linear momentum calculation, Dittmer used a lighter weight for defendant's semi, explaining that prior to weighing defendant's semi, an automobile defendant had been transporting was removed. Hoop noted that using the correct weight would have resulted in a minimum speed that was higher than the minimum speed Dittmer calculated. Hoop agreed with the coefficient of friction Dittmer used to calculate defendant's minimum speed, explaining that the road conditions were a "mixture of ice and snow on the roadway that day." Based on his review of all the evidence and Dittmer's calculations, Hoop concluded that (1) defendant's semi "possessed too much energy entering into that *** crash site" and (2) defendant failed to comply with Scott's Law in that "he should have merged into the right traffic lane to safely pass that crash site."

¶ 56    Hoop admitted that (1) in previous sworn testimony, he described the road conditions on I-39 as "literally a sheet of ice," (2) as written, it would have been impossible for defendant to comply with section 11-907(c)(1) of the Vehicle Code because there was no nonadjacent lane that defendant could have traveled in, and (3) in questioning defendant repeatedly about why he hit SUV 105, defendant consistently responded that he applied his brakes but could not stop. Hoop noted that photographs taken of I-39 after defendant's collision showed snow on the pavement. Hoop also noted that section 11-907(c)(2) of the Vehicle Code requires a vehicle to reduce speed when approaching an accident site but defendant "slammed right through all the vehicles that were parked in the left lane."

¶ 57    Baird, who testified as an expert in the field of commercial motor vehicles, offered statements consistent with the representations he made during the State's offer of proof concerning defendant's March 4, 2013, violation of the 14-hour rule.

¶ 58    The jury was shown a video from the vantage point of Parmley's squad car, which was parked behind engine 102 on the left shoulder of southbound I-39. At certain points, the State would stop the video, and Parmley would describe what was being depicted. Parmley testified that ice was on the interstate and the wind was blowing but visibility was not restricted. The resulting collision terminated the video recording. Parmley described defendant's semi as the "Titantic coming through our original accident scene." After the accident, Parmley successfully stopped southbound traffic on I-39 and attempted unsuccessfully to revive Brown. Parmley then made contact with defendant and asked him, "Do you know how fast you were going[?]" Defendant responded, "Not more than 50 miles an hour."

¶ 59    Thereafter, the State rested its case.

¶ 60                    E. Defendant's Motion for a Directed Verdict

¶ 61    Following the presentation of the State's case in chief, defendant made an oral motion for a directed verdict in which he argued that the State had not satisfied its burden of proof with regard to the element of recklessness. Defendant argued further that taking into account the totality of the circumstances, the collision that occurred was a tragic accident. The court denied defendant's motion, reasoning as follows:

> "The court *** takes the evidence in the light most favorable to the nonmoving party, which is the State ***. The court will not go through all of the specific witnesses' testimony with regard to what it believes is the testimony in the case ***, but the court would note that all the witnesses have testified that the weather was poor on the night in question, that the roadway was slick and snow-covered[,] and that the vehicles were traveling slowly on the night in question and slowing down slower than their normal speeds as they approached the scene ***. All of the witnesses have testified to the lighting of the scene itself as they were approaching the scene. The firefighters all testified to what lights were on the vehicles, the troopers did as well, and by all indications the scene was well lit before the time of the accident and where the scene was warning motorists that something was going on ahead. That is what the court believes that the evidence shows.

> The court believes that the evidence is sufficient *** to show allegedly that the defendant's vehicle did not slow to the point to where he needed to slow *** to avoid coming in contact with the vehicles on the night in question. The court further believes that there is an alleged Scott's [L]aw violation by failing to yield that passing lane and getting into the right lane prior to the accident occurring. The court further thinks that there is circumstantial evidence that potentially could show a logbook violation that potentially caused or contributed to the accident itself.

> Considering those three factors, the court does believe that the evidence is sufficient *** to proceed forward with the case[.] [T]he motion for directed verdict will be denied."

¶ 62    Defendant did not present any evidence.

¶ 63                  F. The Jury's Verdict and Defendant's Sentencing Hearing

¶ 64        Following deliberations, the jury found defendant guilty of reckless homicide.

¶ 65        In April 2014, defendant filed, in pertinent part, a motion for a judgment notwithstanding the verdict (judgment *n.o.v.*), arguing that the State's evidence was insufficient to support a guilty finding.

¶ 66        At his May 2014 sentencing hearing, the trial court first addressed defendant's motion for a judgment *n.o.v.*, ruling as follows:

> "[T]his is a matter that was taken up somewhat similar on the motion for directed verdict at the close of the State's case, and the court issued specific rulings at that point in time[.] *** The charge was reckless homicide that was pled, and the court *** did believe there was evidence in terms of a jury being able to determine that the speed was improper as alleged in the bill of indictment, that the evidence was sufficient, that *** defendant *** did not yield the lane to an emergency vehicle with its lights illuminated, and that was for the jury to decide as to whether that constitutes recklessness.
>
> The court thinks the evidence was sufficient to go to the jury[.] [T]he court thinks that the evidence was sufficient for the jury to return the verdict that was sent in the instructions. So the motion for judgment [*n.o.v.*] will be denied."

¶ 67        The trial court then held defendant's sentencing hearing, at which defendant provided the following statement in allocution:

> "I deeply regret what happened, [Y]our [H]onor, but at the time of the accident I had been [a] truck driver for over a month and I was driving south on [I-]39 and the roads seemed to be clear up north. And while I saw the emergency lights, I assumed that they're on the right side and moved over from the right lane to the left lane and [began] slowing down. When I realized that emergency vehicle on the left lane, I tried to stop my vehicle and I couldn't and lost control and [the] accident happened. *** [M]y heart goes out for *** Brown's family and everybody who got hurt in that accident."

¶ 68        Thereafter, the trial court sentenced defendant to four years in prison.

¶ 69        This appeal followed.


¶ 70                      II. ANALYSIS

¶ 71        Defendant primarily argues that the State failed to prove him guilty beyond a reasonable doubt. Defendant alternatively argues that the trial court erred by denying his motion *in limine*. As to his alternative argument, defendant contends that the court abused its discretion when it permitted the jury to consider alleged violations of (1) the 14-hour rule and (2) Scott's Law because that evidence lacked probative value, was irrelevant, and was prejudicial. Because we agree with defendant's first argument and certain aspects of defendant's alternative assertions, we reverse defendant's conviction and sentence. We conclude that the State's case was utterly bereft of any evidence showing a conscious disregard of anything.


¶ 72                A. The Offense of Reckless Homicide

¶ 73        As previously noted, a person commits reckless homicide when, (1) while driving a motor vehicle, (2) the person "unintentionally kills an individual without lawful justification *** if his acts whether lawful or unlawful *** are such as are likely to cause death or great bodily

harm" and (3) those acts were performed recklessly. 720 ILCS 5/9-3(a) (West 2012). As applied to the offense of reckless homicide, "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that [his acts are likely to cause death or great bodily harm], and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2012); see also 720 ILCS 5/9-3(a) (West 2012).

¶ 74    "Recklessness may be inferred from all the facts and circumstances in the record and may be established by evidence of the physical condition of the driver and his manner of operating the vehicle." *People v. Barham*, 337 Ill. App. 3d 1121, 1127, 788 N.E.2d 297, 302 (2003). Proof of negligence alone, however, cannot sustain a finding of recklessness. *Id.* "While an accident may result from negligence, mere negligence is not recklessness." *People v. Cook*, 2014 IL App (1st) 113079, ¶ 40, 10 N.E.3d 410. "Where an occurrence may be equally attributed to either a negligent cause or a criminal cause, the burden of reasonable doubt cannot be sustained and the negligent cause will be adopted." *Barham*, 337 Ill. App. 3d at 1127, 788 N.E.2d at 302.

¶ 75                                    B. The State's Burden
¶ 76    We have purposefully restated the elements of reckless homicide to reemphasize that by charging defendant with that offense, the State had to prove beyond a reasonable doubt that on March 5, 2013, defendant recklessly operated his semi on the icy road conditions that existed that evening. In other words, the State had to prove that defendant consciously disregarded the danger posed by the less-than-ideal road conditions and, in so doing, engaged in conduct that represented a gross deviation from established norms society expects reasonable persons to undertake given those circumstances.

¶ 77    Although a Scott's Law violation is not an element of the offense of reckless homicide, the State sought to use that violation as probative on the issue of defendant's alleged reckless conduct on the night of the collision. The State also sought to introduce defendant's violation of the 14-hour rule in the same manner—that is, that defendant's violation of the 14-hour rule during the previous day was probative on the issue of his alleged reckless conduct that occurred the following night. Defendant sought to bar such evidence, arguing that both the Scott's Law and 14-hour rule violations lacked probative value, were irrelevant, and were highly prejudicial. The trial court rejected defendant's arguments and permitted the jury to consider that evidence on the issue of defendant's recklessness.

¶ 78                                    C. Defendant's Contentions
¶ 79              1. *Defendant's Motions for a Directed Verdict and Judgment* N.O.V.
¶ 80    By raising a sufficiency of the evidence argument, defendant implicitly challenges the trial court's denial of his motion for a directed verdict at the close of the State's case and, by extension, the court's denial of his posttrial motion for judgment *n.o.v.* See *Maple v. Gustafson*, 151 Ill. 2d 445, 453 n.1, 603 N.E.2d 508, 512 n.1 (1992) ("It is important to note that motions for directed verdicts and motions for judgments *n.o.v.*, although made at different times, raise the same questions, and are governed by the same rules of law."). We choose to address defendant's challenge as such.

¶ 81    "When, at the close of the State's evidence or at the close of all of the evidence, the evidence is insufficient to support a finding or verdict of guilty[,] the court may and[,] on motion of the defendant[,] shall make a finding or direct the jury to return a verdict of not guilty, enter a judgment of acquittal[,] and discharge the defendant." 725 ILCS 5/115-4(k) (West 2012). A directed verdict or a judgment *n.o.v.* is appropriate when a trial court concludes, after viewing all of the evidence in a light most favorable to the State, that no reasonable juror could find that the State had met its burden of proving the defendant guilty beyond a reasonable doubt. *People v. Withers*, 87 Ill. 2d 224, 230, 429 N.E.2d 853, 856 (1981); *People v. Johnson*, 334 Ill. App. 3d 666, 676, 778 N.E.2d 772, 781 (2002).

¶ 82    At the close of the State's case, the evidence before the jury showed that on the evening of March 5, 2013, an accident occurred on I-39 at mile marker 6 between a semi and a pickup truck towing a trailer of auto parts. The firefighters and other first responders who arrived at the scene of the accident consistently described the road conditions on I-39 as (1) "slick" (Hite, Smith), (2) "icy" (Dittmer), (3) "spotty" (Dicken), (4) "snow packed" (Thomas), and (5) "literally a sheet of ice" (Parmley), with drifting snow crossing over I-39 on a cold and windy but clear night. Despite this weather, each firefighter who drove an emergency vehicle testified that his respective rate of speed on I-39 in response to the initial accident site was between 35 to 45 miles per hour. Specifically, Hite characterized the speed that he traveled in his SUV to the accident site as a "safe but moderate speed" of between 35 to 40 miles per hour. Dicken, who drove engine 102, stated that he drove to the accident site at a "fairly decent speed" of between 40 to 45 miles per hour. Smith, who was driving SUV 105, stated that he did not exceed 40 miles per hour in responding.

¶ 83    The evidence presented by the State also showed that mere minutes after Hite halted the traffic control duties being performed by the firefighters traveling in SUV 105, defendant approached mile marker 6 at a speed of not more than 50 miles per hour. Defendant told Hoop that when he saw SUV 105 stopped in the left southbound lane he was traveling in, he attempted to brake but could not stop. The State's expert testified that defendant's minimum speed at the time he collided with SUV 105 was a fraction over 37 miles per hour.

¶ 84    Although several firefighters testified that they did not hear any screeching or squealing of tires that might indicate that defendant attempted to slow his speed, we deem that testimony to be of minimum probative value, if any. The State failed to solicit expert testimony regarding the type of noise a person might expect to hear, if any, when a semi of the type defendant was driving would attempt to brake on an icy road like I-39 on the night in question. The jury was correctly instructed that it could consider its own observations and experiences in life as it evaluated the testimony, but the question of what sound a braking semi on an icy road would make is beyond the ken of the average juror. Jurors' common experiences with the screeching and squealing of tires caused by a vehicle's hard braking on *dry pavement* does not apply to icy roads. If the State wished to argue the absence of braking noises was significant, then it should have provided expert testimony to support this claim. The absence of such testimony renders the State's argument idle speculation.

¶ 85    What we just reviewed was essentially the State's case when the trial court denied defendant's March 2014 oral motion for a directed verdict at the close of the State's case. In denying that motion, the court found that the evidence, considered in a light most favorable to the State, showed that (1) circumstantial evidence of a potential log book violation could be considered a contributing or causal factor of the collision, (2) defendant violated Scott's Law

by failing to change his lane of travel, and (3) defendant failed to sufficiently slow down to avoid the collision. When the court denied defendant's April 2014 motion for a judgment *n.o.v.*, the court reiterated the findings it made when denying defendant's motion for a directed verdict.

¶ 86    For the reasons that follow, we conclude the trial court erred by denying the motion for a directed verdict and, later, the motion for a judgment *n.o.v.*

¶ 87                              2. *The Log Book Violation*

¶ 88    We reject the State's claim that evidence regarding defendant's violation of the 14-hour rule on March 4, 2013, was relevant to the issue of defendant's alleged recklessness on March 5, 2013, the night of the collision at issue. The trial court's decision to require the State to make an offer of proof showing how a violation of the 14-hour rule was relevant to the facts of this case was entirely appropriate, given the concerns the court initially expressed about that relevancy. Unfortunately, the court overcame its concerns and admitted this evidence. That was error.

¶ 89    We conclude that the trial court abused its discretion by ultimately allowing the jury to consider that evidence. See *People v. Patrick*, 233 Ill. 2d 62, 68, 908 N.E.2d 1, 58 (2009) (a trial court abuses its discretion when its ruling is arbitrary, fanciful, or where no reasonable person would take the view adopted by the trial court). The contention that a technical violation of the 14-hour rule the previous night is probative on the issue of recklessness the next night because that violation suggests defendant may have been inattentive as he approached the accident site due to fatigue is not only wildly speculative but also highly prejudicial. This record contains not a shred of evidence that defendant was fatigued at the time of the accident. We emphasize that the record shows that immediately following the technical violation on March 4, 2013, defendant spent the next 10½ hours in the sleeper berth of his semi in satisfaction of the underlying spirit and intent of the Federal Regulation, which is to ensure drivers are well-rested before embarking on a new 14-hour day of activity.

¶ 90                              3. *Scott's Law Violation*

¶ 91    As to the issue of defendant's alleged Scott's Law violation, we conclude that such evidence had minimal probative value, if any, but we also view it as minimally prejudicial. After all, one can hardly dispute that if defendant realized in time the left lane was blocked and he needed to move to the right lane, then he would have done so if the icy roads permitted that maneuver. That is essentially all Scott's Law says.

¶ 92                              4. *Defendant's Speed*

¶ 93    The State characterizes defendant's speed as "not more than 50 miles per hour" despite its own expert evidence that defendant's speed at impact was, at a minimum, slightly above 37 miles per hour. We earlier mentioned the speeds at which the firefighters and police officers said they drove when traveling on I-39 to reach the accident site, and defendant's speed was consistent with—and generally less than—those speeds. Regardless of the actual speed defendant may have been traveling that night, "evidence of excessive speed, by itself, is not sufficient to sustain a conviction of reckless homicide." *Barham*, 337 Ill. App. 3d at 1130, 788 N.E.2d at 305. Instead, the "evidence of excessive speed, combined with other circumstances

that would indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others such that a reasonable person would act differently under the same circumstances, is sufficient to establish reckless homicide." *Id.* In this regard, the State posits that defendant's speed, "combined with the precarious weather conditions" and defendant's failure to decrease his speed or move into the right southbound lane, was clearly reckless. The State's argument is wholly unpersuasive.

¶ 94 The *best* that can be said of the State's case is that defendant may have been inattentive for a few seconds (perhaps adjusting his radio or engaging in some similar activity) and then failed to realize the left lane was blocked as he unsuccessfully attempted to brake his huge semi at night on an icy highway in blowing snow. Such brief inattention (if it even occurred) falls far short of the conscious disregard of a substantial and unjustifiable risk that establishes a gross deviation from the standard of care that the State needed to prove *beyond a reasonable doubt*. This evidence does not come close to meeting that standard.

¶ 95                                III. CONCLUSION
¶ 96 For the foregoing reasons, we reverse defendant's conviction and sentence.

¶ 97 Reversed.