**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210303-U

Order filed February 2, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0303 Circuit No. 18-CF-623 |
| | ) | |
| JESUS GARCIA, | ) ) | Honorable Thomas W. Cunnington, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN* delivered the judgment of the court.
Justices McDade and Peterson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for reckless homicide is reversed for insufficiency of the evidence.

---

*Justice Brennan was substituted for Justice Hauptman after oral argument upon his election to the Third District Appellate Court, effective December 5, 2022. He has read the briefs and listened to the recording of the oral argument.

¶ 2    Following a jury trial, defendant, Jesus Garcia, was convicted of three counts of reckless homicide and sentenced to eight years' imprisonment. On appeal, defendant argues that the State failed to present sufficient evidence to support his conviction and that his sentence was excessive. For the reasons set forth below, we reverse defendant's conviction and thus vacate his sentence.

¶ 3                                    I. BACKGROUND

¶ 4    This case arises out of a 2017 vehicle collision on Interstate-57 near Kankakee involving two semi-tractor trailers and a sedan. Defendant was driving one of the trucks. Two individuals in the sedan died as a result of the collision. Defendant was initially charged with seven counts of reckless homicide, but four of the counts were nol-prossed prior to trial.

¶ 5    Regarding the remaining three counts, count I alleged that, on September 20, 2017, defendant committed the offense of reckless homicide (720 ILCS 5/9-3(e-8) (West 2016)) in that defendant "unintentionally, without lawful justification, while driving a motor vehicle, to wit: a commercial motor vehicle, in a construction zone as defined in Section 11-605.1 of the Illinois Vehicle Code, recklessly performed acts in such a manner as were likely to cause death or great bodily harm to some individual and such acts caused the deaths of 2 persons, Jake H. Hemrick and Michelle M. Crowe, as part of a single course of conduct." Counts II and III separately detailed the same conduct and alleged that defendant caused the individual deaths of Hemrick and Crowe. *Id*. § 9-3(e-7).

¶ 6                                         A. Trial

¶ 7    At defendant's jury trial, the testimony established that the collision occurred shortly after 1 p.m. on September 20, 2017, near milepost 321 on southbound I-57. The weather was clear and sunny. Defendant held a commercial driver's license and had been a truck driver since 2004. At the time of the collision, he was driving a semi-tractor trailer with an open, empty trailer bed (the

International) south on I-57 from Lemont to Kankakee. The International weighed approximately 32,000 to 33,000 pounds.

¶ 8    Dawn Dumas was driving her SUV behind the International when the collision occurred. She testified that, shortly before the collision, she drove southbound onto I-57 from the ramp at milepost 321 and "slid in" to the right lane behind defendant's International. Dumas approximated that she was traveling 30 to 35 miles per hour (mph) at the time. According to Dumas, the speed limit on I-57 was 65 mph, but the left lane was closing, and cars were merging into the right lane, due to a construction zone in the area. The construction zone had a speed limit of 55 mph.

¶ 9    Although she did not know the speed at which the International was traveling, Dumas testified that it was traveling faster than she was and that she "backed off" and fell in behind it as the International pulled away from her. Dumas could not see anything in front of the International. As she was "getting up to speed"—about 3/4 of a mile after she drove onto I-57—the International locked up its brakes, causing its empty trailer to bounce. Dumas did not recall seeing brake lights on the International. Dumas applied her brakes and drove onto the right shoulder of I-57. She never made it "up to speed."

¶ 10    Dumas exited her car, and as she approached the front of the International, she realized a collision had occurred. Dumas observed a blue Toyota crushed in between the International and another semi-tractor trailer with an enclosed trailer (the Freightliner). There were three individuals inside the Toyota. The driver and back-seat passenger were alert but trapped inside the car; the front-seat passenger was unconscious. Dumas called 911.

¶ 11    The driver of the Freightliner was Joda Duncan, Jr. He too held a commercial driver's license and had been a truck driver for 18 years. Duncan was hauling shredded paper in the Freightliner's 53-foot, enclosed trailer at the time of the collision and estimated that the truck and

full trailer weighed 70,000 pounds at the time. Duncan testified that, as he traveled south on I-57 in the right lane near milepost 321, he saw road construction, cones pushing traffic into the right lane, and signs indicating that the left lane was closing.

¶ 12    Duncan was familiar with I-57 and believed the speed limit was 55 mph through the construction zone. Duncan was traveling approximately 50 to 55 mph but slowed his speed because traffic was virtually stopped, and "everybody from the left lane was trying to get into the right lane." Duncan then came to a complete stop, without locking his brakes, for approximately 30 seconds to 1 minute, when he suddenly felt a "tremendous jolt." Duncan exited his truck, heard screaming, and walked around to the back of his trailer. Duncan observed part of the Toyota underneath his trailer and defendant's International pushed against the back of the Toyota. Duncan did not notice either the Toyota or the International prior to the collision.

¶ 13    Duncan testified that defendant exited his truck when the fire department arrived. Duncan recounted their ensuing conversation. Defendant asked Duncan why he had stopped. Duncan responded that he did not have a choice because the vehicles in front of him stopped. Defendant replied, "No. No. *** You go, *** and the car come in behind you, and I couldn't stop." At this point, Duncan stated, "That's not how it happened." Duncan and defendant argued, at which point Duncan walked away and informed a police officer that defendant was the driver of the truck that hit the Toyota.

¶ 14    Illinois State Troopers Justin Kokos and David Verkler responded to the scene of the collision. Their testimony established that, at the scene and later that day, defendant told the police that the Toyota swerved in front of his International and cut him off and that the driver of the Toyota slammed on the brakes when the driver of the Freightliner slammed on the brakes. Defendant further informed the police that he was traveling at 60 mph at the time of the collision,

that Duncan's Freightliner was traveling at approximately the same speed, and that his truck hit the Toyota after the Toyota hit the Freightliner. Defendant submitted blood and urine samples on the day of the collision; no drugs or alcohol were detected in defendant's system.

¶ 15    Trooper Kokos identified State's exhibits Nos. 3 to 8, which depicted advance warning signs to drivers on both sides of the southbound lanes on I-57, near milepost 321, on the date of the collision. He testified that the signs cautioned that construction and work zones were approaching, the speed limit was decreasing to 55 mph, and traffic was merging into the right lane due to the left-lane closure. The exhibits were admitted into evidence.

¶ 16    Trooper Verkler testified that he was at a gas station when he overheard a police radio dispatch alerting units to a crash on southbound I-57 near milepost 321. About 15 to 20 minutes prior to that time, Verkler had driven south on I-57 through the same area where the collision occurred and described the traffic as stop-and-go through the construction zone. Verkler further testified that the speed limit on I-57 was normally 70 mph, but the "work zone" speed limit was 55 mph.

¶ 17    Verkler identified State's exhibits Nos. 3 to 8 as the advance warning signs to southbound drivers of the approaching construction and work zones, reduced speed limit, and left-lane closure. In addition, Verkler testified that the first sign he saw was a digital sign located just north of milepost 322. Verkler described the sign as a flatbed truck located on the right-hand shoulder "with an attenuator type apparatus to the rear of it, and on that was a digital sign that alerted to caution of traffic; traffic stopped ahead." Verkler testified that the sign was apparently no longer there several hours later when the scene was photographed.

¶ 18    Verkler also testified as an expert in accident reconstruction. He photographed the scene and described the damage to the Toyota as a "vehicle crush." Verkler observed deflation marks,

gouge marks, and skid marks caused by the collision, including 50-foot-long skid marks made by defendant's International. Verkler explained that, in crashes involving commercial motor vehicles, the larger vehicle will "override the car and force the car to go down," causing marks in the road.

¶ 19    The International's event data recorder was destroyed in the collision, but the Toyota's event data recorder was intact. The length of time that the Toyota's recorder retained data was 4.95 seconds prior to deployment of the airbags upon impact (with new data recording every half second).

¶ 20    Verkler testified regarding the Toyota's recorded data. The Toyota's steering wheel was pointed straight ahead, meaning that the Toyota did not make any lane changes during the recorded time. The first impact that the Toyota experienced was a rear impact. At 4.95 seconds before impact, the Toyota was traveling .6 mph. At 4.45 seconds before impact, the Toyota was completely stopped. However, the Toyota's brake was applied throughout the recorded 4.95 seconds. Verkler opined that, based upon the lack of variation in the longitude and acceleration rate, the Toyota made a "normal stop," as opposed to a sudden stop.

¶ 21    Verkler further testified that defendant's statement that he was traveling at approximately 60 mph was consisted with the reconstruction of the collision. At 60 mph, defendant would have covered approximately 88 feet per second. At 4.95 seconds from impact, defendant's International would have been 436.28 feet behind the Toyota. Had defendant begun braking when the Toyota stopped, the International would have come to a stop within 214.3 to 342.9 feet. In other words, the International would not have hit the Toyota, having stopped at least 93.38 feet behind it (436.28 feet minus 342.9 feet).

¶ 22    Verkler concluded that, based upon his reconstruction and rendition of the collision, Duncan's Freightliner was stationary in the right lane, with the Toyota 33 feet (or 2 car lengths)

directly behind it. The Toyota was completely stopped for approximately 4.5 seconds prior to impact, struck by defendant's International, forced forward or in a southward direction, and pinned or shoved underneath the Freightliner.

¶ 23    Following the close of the State's case, defendant moved for a directed verdict on the basis that there was no evidence of reckless conduct. The trial court denied the motion, reasoning that it was a factual issue as to whether, under the circumstances, defendant's conduct amounted to recklessness. Defendant testified on his own behalf. At the time of the collision, he was driving the International on I-57 in the right, southbound lane toward Kankakee. Defendant recalled that the speed limit on I-57 was 70 mph; he did not see any signs indicating a lower speed limit; and, while he could not recall the speed at which he was traveling, he was moving with the speed of traffic. According to defendant, "[t]here were hardly any indicators that there was a construction site."

¶ 24    As he was traveling behind the Freightliner, the Toyota "got in between us and reduced [] the distance between us." Defendant explained that he did not immediately brake because the cars were traveling at the same speed. He further stated that traffic was not stopped, but he could not see in front of the Freightliner because the truck was blocking his vision.

¶ 25    Specifically, defendant testified:

> "I was coming behind this car when—and the car, following behind them, and as we were going along, everybody was going along the same speed. And then I see that the [Freightliner] stops. The back of the [Freightliner] almost in my face and immediately the strike occurred. The hit. The shock.
>
> This happened so quickly, one or two seconds, and then it's done. I didn't have an opportunity or time to do anything. I didn't have time to brake."

¶ 26　Defendant remained inside his truck after the collision. At that time, he "knew something bad had just occurred"; he did not know that fatalities were involved; and he was "very surprised" and "really afraid." Defendant testified regarding feeling "very bad" about what happened.

¶ 27　On cross-examination, defendant acknowledged that he obtained a commercial driver's license and was trained to recognize various road signs (including signs to merge and reduce speed), remain attentive to driving conditions, expect stopped traffic, and maintain sufficient space between his truck and the vehicle in front of him to effectuate a stop. When questioned as to whether he applied his brakes right before the crash, defendant testified that he did not recall and that "there wasn't any need to brake because all of us were going at the same speed."

¶ 28　Following deliberations, the jury returned a verdict of guilty on all three counts of reckless homicide. The trial court entered a conviction on count I only, finding that counts II and II merged into count I.

¶ 29　　　　　　　　　　　B. Posttrial Proceedings

¶ 30　Defendant timely filed a motion for a new trial. Following briefing and argument, the trial court denied the motion. The case proceeded to a sentencing hearing, after which the trial court sentenced defendant to eight years' imprisonment. Defendant timely moved to reconsider the sentence. Following argument, the trial court denied the motion. Defendant timely appealed.

¶ 31　　　　　　　　　　　II. ANALYSIS

¶ 32　On appeal, defendant challenges the sufficiency of the evidence to support his reckless homicide conviction and the length of his sentence. For the reasons set forth below, we reverse defendant's conviction and do not address the challenge to his sentence.

¶ 33　The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. A reviewing court faced with a challenge to the sufficiency

of the evidence must determine "whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* The reviewing court's role is not to retry the defendant. *Id.* Rather, it is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* Thus, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* A criminal conviction will not be reversed unless the evidence is so unreasonable, improbable, or unsatisfactory that it leaves reasonable doubt of the defendant's guilt. *Id.*

¶ 34    Here, to sustain the reckless homicide conviction as charged in the indictment, the State was required to prove beyond a reasonable doubt that defendant unintentionally, without lawful justification, while driving a motor vehicle in a construction zone, recklessly performed acts in such a manner as were likely to cause death or great bodily harm to some individual and such acts caused the deaths of two persons as part of a single course of conduct. 720 ILCS 5/9-3(e-8) (West 2016). The parties do not dispute that defendant drove his truck in a construction zone, struck the stopped Toyota, and caused the death of two people. The issue was whether his actions were reckless.

¶ 35    "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2016). An act performed recklessly is performed wantonly. *Id.* " 'While an accident may result from

negligence, mere negligence is not recklessness.' " *People v. Shakirov*, 2017 IL App (4th) 140578, ¶ 74 (quoting *People v. Cook*, 2014 IL App (1st) 113079, ¶ 40)).

¶ 36    This court has delineated three general categories of reckless driving cases: (1) those involving the commission of multiple traffic offenses that collectively demonstrate the driver's willful and wanton disregard for the safety of persons and property; (2) cases involving a driver's conscious disregard for the particular surroundings and circumstances that rises to the level of willfulness and wantonness; and (3) those cases in which willful and wanton conduct is based partially upon the driver's intoxication or impaired state. *People v. Paarlberg*, 243 Ill. App. 3d 731, 735-36 (1993). "[C]ases that do not fall into at least one of [these categories] have not survived appellate review." *Id*. at 736.

¶ 37    The parties center their arguments around the second set of cases, the first and third categories being inapplicable. The State did not assert the commission of multiple traffic offenses, and testing reflected no drugs or alcohol in defendant's system. We turn to the second category of reckless driving cases.

¶ 38    As illustrative of this category, the court in *Paarlberg* cited several cases in which the defendant's excessive speed, *combined* with other circumstances, amounted to recklessness. *Id.* at 735-36 (citing, *inter alia*, *People v. Ziegler*, 78 Ill. App. 3d 490, 496 (1979) (excessive speed, dangerous lane changes, cutting off other cars, and failing to reduce speed while approaching standing vehicle that displayed brake lights and turn signal); *People v. Griffith*, 56 Ill. App. 3d 747, 751 (1978) (driving twice the speed limit and losing control of the vehicle despite familiarity with speed limit and sharp curve in narrow residential street); *People v. Burch*, 19 Ill. App. 3d 360, 364 (1974) (speeding, passing three cars at one time while children were on the roadside, and forcing an oncoming car to pull off the road); *People v. Prendergast*, 95 Ill. App. 2d 41, 44 (1968)

- 10 -

(speeding 25 to 45 miles over the speed limit at noon in area adjacent to shopping mall where large numbers of people and vehicular traffic were to be expected)).

¶ 39    Subsequent cases have reiterated that " 'evidence of excessive speed, by itself, is not sufficient to sustain a conviction of reckless homicide.' " *Shakirov*, 2017 IL App (4th) 140578, ¶ 93 (quoting *People v. Barham*, 337 Ill. App. 3d 1121, 1130 (2003)). Instead, in addition to evidence of excessive speed, there must be evidence of other circumstances to indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others such that a reasonable person would act differently. *Id.*

¶ 40    Defendant argues that his speed was not excessive. Rather, it was undisputed that he drove only five miles over the speed limit. Moreover, defendant argues that the State failed to present sufficient evidence of additional circumstances that elevated defendant's conduct to recklessness. The State responds that it established the excessiveness of defendant's speed under the circumstances and presented additional evidence of recklessness. Namely, the State introduced evidence regarding the advance warning signs to southbound drivers on I-57 near milepost 321— signs that cautioned about the merging lanes, approaching construction zone, decreased speed limit, and stopped traffic. Witnesses also described the traffic in this area as heavily congested and virtually stopped due to the construction zone and left-lane closure.

¶ 41    Reviewing the record evidence in the light most favorable to the State, we nevertheless conclude that the State failed to meet its burden of proving beyond a reasonable doubt that defendant consciously disregarded a substantial and unjustifiable risk that established a gross deviation from the standard of care. Initially, the record reflects insufficient evidence that defendant's speed was in fact excessive. It was undisputed that defendant drove five miles over the speed limit. As the appellate court in *People v. Jakupcak*, 275 Ill. App. 3d 830, 838 (1995),

stated, "[d]riving five miles over the speed limit, while technically violative of the law, does not qualify as driving at an 'excessive' speed."

¶ 42 Moreover, as defendant points out, the reckless homicide statute itself provides that, in cases involving reckless homicide in which the defendant unintentionally kills an individual while driving in a construction zone when workers are present, the trier of fact may infer that the defendant's actions were performed recklessly when the defendant was also driving "at a speed of more than 20 miles per hour in excess of the posted speed limit." 720 ILCS 5/9-3(e-11) (West 2016). Defendant was not charged under this subsection and notes the lack of any evidence that workers were present in the construction zone. Nonetheless, defendant's point, which is well taken, is that the threshold at which recklessness may be inferred, even when workers are present, is four times the amount by which he exceeded the speed limit.

¶ 43 In addition to the lack of evidence that defendant's speed was excessive, the State failed to present sufficient evidence of other circumstances indicating defendant's conscious disregard of a substantial risk likely to cause death or great bodily harm to others. There was no evidence that defendant's route presented sharp turns to navigate, that he cut off other cars, or that he executed dangerous lane changes. To the contrary, the testimony established that defendant was driving in the right lane—the lane into which traffic was merging.

¶ 44 The State maintains that it was reasonable to infer that defendant saw the advance traffic warning signs—posted approximately a mile before the crash scene—but simply ignored them. Given the testimony regarding the stop-and-go nature of the traffic, the State argues that the combination of defendant's speeding with his failure to heed the advance warning signs of road conditions amounted to a conscious disregard for his surroundings and circumstances.

¶ 45    A similar argument was rejected by the appellate court in *Shakirov*, 2017 IL App (4th) 140578. There, the defendant was driving his semi-tractor trailer on the icy, snowy interstate late at night, collided with emergency vehicles that were responding to an earlier accident, and struck and killed an emergency responder. *Id.* ¶¶ 36-40. In reversing the defendant's reckless homicide conviction for insufficiency of the evidence, the appellate court initially noted that, "[r]egardless of the actual speed defendant may have been traveling that night, 'evidence of excessive speed, by itself, is not sufficient to sustain a conviction of reckless homicide.' " *Id.* ¶ 93 (quoting *Barham*, 337 Ill. App. 3d at 1130).

¶ 46    Moreover, the court rejected the State's argument that the defendant's speed, combined with the precarious weather conditions and failure to decrease his speed or change lanes, was reckless. *Id.* In doing so, the court reasoned:

> "The *best* that can be said of the State's case is that defendant may have been inattentive for a few seconds (perhaps adjusting his radio or engaging in some similar activity) and then failed to realize the left lane was blocked [with the emergency vehicles] as he unsuccessfully attempted to brake his huge semi at night on an icy highway in blowing snow. Such brief inattention (if it even occurred) falls far short of the conscious disregard of a substantial and unjustifiable risk that establishes a gross deviation from the standard of care that the State needed to prove *beyond a reasonable doubt*. This evidence does not come close to meeting that standard." (Emphases in original.) *Id.* ¶ 94.

¶ 47    Likewise, here, the evidence established that defendant was driving five miles over the speed limit and failed to brake in time to avoid the collision. As in *Shakirov*, any brief inattention to the advance warning signs and road conditions did not amount to a conscious disregard of a substantial and unjustifiable risk establishing a gross deviation from the standard of care. The State

maintains that defendant's failure to brake sooner cannot be characterized as a momentary distraction, given the evidence that traffic was stopped for at least 30 seconds to a minute before the collision. However, the expert testimony established that defendant attempted to brake, leaving 50-foot-long skid marks, and that defendant could have avoided the collision by braking just over one second earlier. Under the circumstances, and as set forth *supra*, we cannot say that the evidence in this case met the standard that the State was required to prove to establish defendant's recklessness.

¶ 48    In sum, viewing all of the evidence in the light most favorable to the State, the State failed to prove defendant's guilt beyond a reasonable doubt. Accordingly, we reverse his conviction for reckless homicide.

¶ 49                                  III. CONCLUSION

¶ 50    For the foregoing reasons, we reverse defendant's conviction and vacate his sentence.

¶ 51    Conviction reversed; sentence vacated.