THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM R. BARHAM, Defendant-Appellant.

Fifth District   No. 5—02—0047

Opinion filed April 1, 2003.

Edward J. Kionka, of Carbondale, and Randy Patchett, of Patchett Law Office, of Marion, for appellant.

D. Brian Trambley, State's Attorney, of Vienna (Stephen E. Norris and Kendra S. Peterson, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE MAAG delivered the opinion of the court:

Following a bench trial in the circuit court of Johnson County, William R. Barham (defendant) was convicted of two counts of reckless homicide arising from an automobile accident. Defendant was sentenced to a term of four years' imprisonment and an additional term of mandatory supervised release on each count. The sentences were to run concurrently. On appeal, defendant contests the sufficiency of the evidence to support the convictions. Defendant also contends that the trial court erred in its rulings on a number of evidentiary issues and in sentencing defendant on each count of reckless homicide when the convictions were based on the same acts.

A fatal automobile accident occurred on Illinois Route 147, approximately one-half mile north of Simpson, Illinois, between 11:30 p.m. and midnight on October 14, 2000. Defendant and Jerry Isom, both of whom were employees of the Illinois Department of Corrections, were in the vehicle. The vehicle went off the roadway and down an embankment and crashed into a tree. Jerry Isom died as a result of massive injuries he suffered in this accident.

The evening had started with a fund-raising event for a state representative. Defendant drove to the Harrisburg airport, along with Jerry Isom, to transport the Director of Corrections to the event. Defendant, the warden at Shawnee Correctional Center, was driving his state-issued Chevrolet Impala. The fund-raiser was held at Southeastern Illinois College. Alcoholic beverages were not served. After about an hour, the Director indicated that he was ready to leave. Defendant and Jerry Isom transported him back to the airport and then met some colleagues at the Lakeside Bar and Grill (Lakeside). They arrived at Lakeside a little before 6 p.m.

Major Mike Mott, a corrections supervisor and friend of defendant, testified that he bought the first round of drinks. He ordered a Miller Lite beer for defendant. No one else in the party was drinking that brand of beer. Mott testified that he saw defendant drink only one beer that night. He stated that defendant left the table and went to his car several times throughout the evening to make telephone calls. Mott said that defendant was making calls because of an incident that occurred when they had first arrived at Lakeside. A politician had approached the table and expressed his displeasure that the men had attended the fund-raiser. Mike Mott testified that he was a friend of defendant and that he knew him well. He noted that defendant had been sick for several days preceding the fund-raiser.

There was conflicting evidence regarding the amount of alcohol that defendant had been served that evening. The State called three servers from Lakeside, who stated that they had worked defendant's table. Amanda Hogg testified that she served defendant one beer at about 7 p.m. and that she did not see him after his group moved to a table outside. Ashley Roper, who worked 14½ hours at Lakeside that day, testified that she served three beers to defendant. Sheila Miles, who also worked 14½ hours, testified that she served defendant about four or five beers. Neither Roper nor Miles could specifically recall what she served to other members of the group or any patron other than defendant that evening. None of the servers could state that defendant consumed the beers they delivered to him or how much beer defendant consumed that evening. A bar tab for defendant's party showed that two Miller Lite beers had been served. No one testi-

fied that defendant was intoxicated or that he was behaving erratically that evening. Defendant and Jerry Isom left the bar and headed home to Vienna between 10:30 p.m. and 11 p.m.

At approximately 12:02 a.m. (on October 15, 2000), Daniel Stockdale was driving from his girlfriend's home to his own on northbound Illinois Route 147 when he spotted a white vehicle off the road and down the embankment. Daniel and his girlfriend had driven past this same stretch a little earlier, about 11:30 p.m., and had not noticed the vehicle, so he stopped to investigate. As he approached the vehicle, Daniel noticed that the passenger side was wrapped around a tree. He also noticed that the driver's side door was open. He peered in and saw defendant leaning against the steering wheel. Daniel returned to his girlfriend's house to call for help. Daniel explained what he had seen to his girlfriend's father, Charles James. James called 9-1-1.

Daniel returned to the accident scene about 10 minutes later accompanied by James. Emergency personnel had not yet arrived. While Daniel parked his car, James approached the vehicle. James saw that defendant was trying to exit the vehicle. James encouraged defendant to stay in the car until help arrived, but defendant pulled himself out of the vehicle and then lay on the ground. James said that defendant seemed to be having trouble breathing but that he did not notice any active bleeding or any obvious injuries to defendant. Daniel and James stayed with defendant and talked with him until medical personnel arrived. Daniel and James were within a few feet of defendant's face. Neither detected the odor of an alcoholic beverage on defendant's breath.

Johnson County sheriff's deputies arrived at the scene at approximately 12:16 a.m. Deputy Schierbaum conducted a quick assessment of defendant as he lay on the ground. He did not detect the smell of any alcoholic beverage on defendant's breath. Johnson County medics arrived at the scene at approximately 12:27 a.m. Paramedic Cheila Ellis made an assessment of defendant, immobilized his spine, and placed him in an ambulance. In her initial assessment, she noted that defendant had several hematomas on the top of his head, that lung sounds on his right side were diminished, and that his right pupil was nonreactive to light. She started an IV of normal saline and lactated ringers solution. At that time, defendant was alert and responsive. He did not have trouble speaking. Ellis asked defendant if he had been drinking and defendant responded yes. She stated that the inquiry was normal procedure and that the question is asked in order to determine whether it is safe to give certain medications to a patient. Ellis testified that she noted a smell of alcoholic beverages coming from defendant's breath. Illinois state trooper Jay Hall, who

had been dispatched to the scene, was present in the ambulance when Ellis questioned defendant. Trooper Hall stated that he noticed the smell of alcoholic beverages on defendant's breath. At 12:50 a.m., Trooper Hall informed defendant that he was under arrest for driving under the influence of alcohol.

Defendant was transported from the scene at 1:06 a.m. The ambulance took him to Lourdes Hospital in Kentucky for further treatment. As a part of the hospital's protocol, a serum blood-alcohol test was ordered in the emergency room. The phlebotomist made the blood draw sometime between 1:45 and 2 a.m. At approximately 2:20 a.m., defendant went into respiratory failure while in the radiology department. He was intubated and transferred to the intensive care unit. Trooper Hall attempted to interview defendant at approximately 3:30 a.m. Defendant was nonresponsive, so Trooper Hall ordered a nonvoluntary blood draw using an Illinois State Police kit. This sample was obtained for investigative purposes. The blood was drawn by the hospital phlebotomist at approximately 3:32 a.m. Defendant remained hospitalized in the intensive care unit for several days. He was treated for a traumatic brain injury and other injuries.

Jerry Isom was trapped in the vehicle. His legs were pinned between the seat and the floorboard on the passenger side of the vehicle. His torso and head were lying across the middle of the hood. Emergency medical personnel detected a weak pulse and requested assistance from the Vienna fire department. Fire department personnel noted that the driver's door was the only door that could be opened without force, so they removed the roof in order to gain access to the interior of the vehicle. Resuscitation efforts were commenced immediately after Isom was extricated from the vehicle. He was transported to Lourdes Hospital, where he was pronounced dead shortly after he arrived.

Defendant was indicted on three counts of reckless homicide and two counts of aggravated driving under the influence of alcohol. Following a three-week bench trial, the trial court found defendant guilty on counts II and III of the indictment. As to count II, the court found that defendant was guilty of reckless homicide and caused the death of Jerry Isom by driving a vehicle while he was under the influence of alcohol to a degree that rendered him incapable of safely driving and by driving at a speed greater than was reasonable and proper considering existing traffic conditions and the safety of persons properly on the roadway. As to count III, the court found that defendant was guilty of reckless homicide and caused the death of Jerry Isom by operating a motor vehicle at a speed that was greater than was reasonable and proper with regard to existing traffic conditions and the

safety of persons properly on the road. The court also found defendant guilty of one count of aggravated driving under the influence of alcohol (count IV), but the court vacated that conviction prior to sentencing because that count contained the same allegations as those set forth in count II of the indictment.

Initially, defendant claims that the evidence was insufficient to prove beyond a reasonable doubt (1) that he was operating the vehicle at the time of the accident, (2) that he was operating the vehicle recklessly, and (3) that at the time of the accident, he was under the influence of alcohol to a degree that rendered him incapable of safely operating the vehicle.

## DISCUSSION

■ When reviewing the sufficiency of the evidence to support a conviction for reckless homicide, we must consider whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Smith*, 149 Ill. 2d 558, 565, 599 N.E.2d 888, 891 (1992). A defendant is guilty of reckless homicide if he causes the death of a person while driving a motor vehicle and the acts which caused the death are such that they are likely to cause death or great bodily harm to some individual and are performed recklessly. *People v. Bonzi*, 65 Ill. App. 3d 927, 931, 382 N.E.2d 1300, 1302 (1978). A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that his acts are likely to cause death or great bodily harm to some individual and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. *People v. Potter*, 5 Ill. 2d 365, 368, 125 N.E.2d 510, 511 (1955); *People v. Jakupcak*, 275 Ill. App. 3d 830, 838, 656 N.E.2d 442, 448 (1995). Recklessness may be inferred from all the facts and circumstances in the record and may be established by evidence of the physical condition of the driver and his manner of operating the vehicle. *Smith*, 149 Ill. 2d at 565, 599 N.E.2d at 891; *People v. Gosse*, 119 Ill. App. 3d 733, 738, 457 N.E.2d 129, 133 (1983). Proof of negligence alone cannot sustain a finding of recklessness. *Gosse*, 119 Ill. App. 3d at 738, 457 N.E.2d at 133. Where an occurrence may be equally attributed to either a negligent cause or a criminal cause, the burden of reasonable doubt cannot be sustained and the negligent cause will be adopted. *Potter*, 5 Ill. 2d at 372, 125 N.E.2d at 513.

## Count III

We will first consider count III. Count III of the indictment is based on the allegation that defendant drove at a speed that was

greater than reasonable and proper with regard to existing traffic conditions and the safety of persons on the roadway. The record reveals that the State presented the testimony of Barbee Braddy, an Illinois state trooper, and Donald Floyd, a project engineer from General Motors Corporation (General Motors), in an attempt to establish the speed of the vehicle prior to and at the time of the impact.

Trooper Braddy was assigned to investigate the accident and to perform an accident reconstruction. She arrived at the scene about 4:34 a.m. and began her investigation. Trooper Braddy noted that Route 147 was a two-lane highway that was approximately 19 feet in width. She noted that the accident occurred at a curve in the roadway and that the pavement was reportedly dry at the time of the accident. Based on physical evidence gathered at the scene, Trooper Braddy described the sequence of events during the accident. She stated that the vehicle's rear right tire dropped off the north lip of the road at or near the curve. She opined that the vehicle was traveling at approximately 73 miles per hour at that time. Trooper Braddy testified that tire marks on the roadway provided evidence that the driver made a steering correction to return the tire to the paved roadway, but oversteered. The vehicle went into a skid after the rear wheel returned to the roadway, traveled across the road, and left the south side of the road. At that time, the vehicle's speed was approximately 52 miles per hour. The vehicle went down the incline in a counterclockwise motion, and the passenger side of the vehicle impacted a tree. Trooper Braddy calculated an impact speed of 50.97 miles per hour.

Donald Floyd testified that defendant's vehicle was equipped with a sensing and diagnostic module that controls the deployment of the air bag system in General Motors vehicles. Floyd testified that the module has a downloading tool that records precrash data regarding speed, braking, engine throttle position, seat belt usage, air bag deployment data, and velocity of the crash. He stated that the data obtained from defendant's vehicle showed a speed of 76 miles per hour at approximately five seconds before the crash and an impact speed of 52 miles per hour.

Other than evidence of the vehicle's speed at the time of the accident, the record contained no evidence of other circumstances that would indicate recklessness on the part of the driver. The State produced no evidence of the posted speed limit for the stretch of Route 147 where the accident occurred. There is no evidence that the road was wet or slippery at the time of the accident. There is no evidence indicating that defendant was driving erratically or weaving in and out of traffic prior to the accident. In fact, there was no evidence regarding traffic conditions at and near the place of the accident.

There is no evidence that defendant was acting erratically during the evening or after he left Lakeside.

In its brief, the State suggests that the trial court could have determined that the driver was traveling at an unreasonable speed by taking judicial notice, *sua sponte*, of section 11—601(d) of the Illinois Vehicle Code (625 ILCS 5/11—601(d) (West 2000)), which provides that the maximum speed for passenger vehicles traveling on two-lane highways in Illinois is 55 miles per hour.

■ The doctrine of judicial notice authorizes the trial court to take judicial notice of an Illinois statute. 735 ILCS 5/8—1003 (West 2000). However, the statute must be material to a determination of the issues in the case, and the party must present the statute to the court in some way and request that judicial notice be taken. See *Woods v. Village of La Grange Park*, 287 Ill. App. 201, 209, 4 N.E.2d 764, 768 (1936). A court is not required to take judicial notice without a proper request to do so. *People v. Varnado*, 66 Ill. App. 3d 413, 419, 384 N.E.2d 37, 41 (1978). "A party desiring to have a fact judicially noticed should bring the matter to the attention of the court, on the record. If he does not, the court of review will not ordinarily judicially notice such fact." *People v. Clifton*, 11 Ill. App. 3d 112, 114, 296 N.E.2d 48, 50 (1973).

■ In rare instances, a trial judge may take judicial notice, *sua sponte*, of facts, as long as the judge makes clear during the course of the trial and not after the evidence is closed what facts and sources are included in the *sua sponte* notice. See *People v. Rotkvich*, 256 Ill. App. 3d 124, 130, 628 N.E.2d 888, 893 (1993); *People v. Speight*, 222 Ill. App. 3d 766, 772, 584 N.E.2d 392, 396 (1991), *rev'd on other grounds*, 153 Ill. 2d 365, 606 N.E.2d 1174 (1992). It is well established that concepts of fair play require that all parties to an action be given a fair opportunity to confront and to rebut any evidence which might be damaging to their position. See *Drovers National Bank of Chicago v. Great Southwest Fire Insurance Co.*, 55 Ill. App. 3d 953, 957, 371 N.E.2d 855, 858 (1977). A party has the same right to rebut evidence admitted by *sua sponte* judicial notice as it does to rebut evidence introduced by the opposing party.

■ A trial court, sitting as the trier of fact, may only consider knowledge acquired through the introduction of evidence or through judicial notice and may not rely on private knowledge of matters outside the record. See *People v. Wallenberg*, 24 Ill. 2d 350, 354, 181 N.E.2d 143, 145 (1962) (it was reversible error for the trial judge to reject the defendant's alibi, where the alibi statement indicated that there were no gas stations on a particular road, based upon the judge's reliance on personal knowledge that there were gas stations on a

particular road). When a defendant in a criminal trial waives a trial by jury and submits his rights and liberty to a judge, that judge is in the identical position of the jury and all of the recognized rules for the protection of the defendant's rights apply with equal force. *People v. Rivers*, 410 Ill. 410, 419, 102 N.E.2d 303, 307 (1951).

■ A reviewing court will not take judicial notice of critical evidentiary material that was not presented to and not considered by the fact finder during its deliberations. See *Vulcan Materials Co. v. Bee Construction*, 96 Ill. 2d 159, 449 N.E.2d 812 (1983); *Ashland Savings & Loan Ass'n v. Aetna Insurance Co.*, 18 Ill. App. 3d 70, 78, 309 N.E.2d 293, 299 (1974). Judicial notice cannot be extended to permit the introduction of new factual evidence not presented to the trial court. *Ashland Savings & Loan Ass'n*, 18 Ill. App. 3d at 78, 309 N.E.2d at 299.

■ In this case, the State did not ask the trial court to take judicial notice of the statute during the trial. The trial court did not announce during the trial that it was taking judicial notice of the statute. The court did not refer to the speed limit as a fact supporting its finding that defendant drove at an excessive rate of speed. Nothing in the record suggests that the court relied on its own knowledge or, alternatively, took judicial notice, *sua sponte*, of the speed limit governing the section of the roadway where the accident occurred. Although it is clear that establishing excessive speed was a critical element of the State's proof of the crime, it offered no evidence to establish the speed limit. We decline to take judicial notice of a material fact that was not considered by the fact finder and that defendant had no opportunity to rebut. Since there is no indication that the speed limit was considered in the trial court's deliberations, that evidence will not be considered in reviewing the sufficiency of the evidence to support the convictions in this case.

Though evidence of excessive speed, by itself, is not sufficient to sustain a conviction of reckless homicide, evidence of excessive speed, combined with other circumstances that would indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others such that a reasonable person would act differently under the same circumstances, is sufficient to establish reckless homicide. *Potter*, 5 Ill. 2d at 371, 125 N.E.2d at 513; *Jakupcak*, 275 Ill. App. 3d at 838, 656 N.E.2d at 448-49. In this case, the State established that the vehicle was traveling at approximately 73 miles per hour before the accident. But there is no evidence in the record to establish that the vehicle was traveling too fast in light of the weather, the traffic, or the road conditions. Though it may have been negligent to travel at such a speed on this stretch of roadway, the evidence in the

record is insufficient to prove beyond a reasonable doubt that the condition of defendant or the conditions of the roadway made it unjustifiably risky to operate a vehicle at 73 miles per hour at the time and place of the accident or that such action constituted a gross deviation from the standard of care that a reasonable person would exercise in the same situation. The evidence is insufficient to support a conviction beyond a reasonable doubt on count III of the indictment. The conviction must be reversed.

## Count II

We will now consider count II. Count II of the indictment is premised on allegations that defendant operated a motor vehicle at a speed that was greater than was reasonable and proper while under the influence of alcohol to a degree that rendered him incapable of safely driving. The record reveals that the State relied upon a number of lay witnesses and the testimony of Cathy Anderson, an analyst who worked for the Illinois State Police, in order to establish that defendant was driving under the influence of alcohol when the accident occurred.

In this case, there is no doubt that defendant had been drinking beer prior to the accident, but there is little evidence regarding the quantity consumed. Paramedic Ellis and Trooper Hall testified that they detected the odor of alcoholic beverages on defendant's breath while he was in the ambulance. Paramedic Ellis testified that defendant admitted that he had been drinking prior to the accident, although he did not say how much he had consumed. There was evidence that defendant was served anywhere from two beers to nine beers in a four-hour period. Neither the servers nor any other witness had any knowledge regarding the amount of beer defendant consumed that evening. Mike Mott and defendant were the only witnesses who provided testimony regarding consumption. Mike Mott stated that he saw defendant drink one beer. Defendant testified that he drank one beer and most of a second.

Neither the servers nor any other witness testified that defendant appeared to be intoxicated or behaved inappropriately while he was at Lakeside. There is no evidence that defendant was driving erratically, weaving through traffic, or unable to maintain his lane at any time prior to encountering the curve where the accident occurred. Neither the lay witnesses nor emergency personnel who assisted defendant after the accident testified that he had bloodshot, glassy eyes or slurred speech. No one testified that defendant displayed erratic behavior or any other typical characteristic of intoxication. This is not a case, such as *People v. Latto*, 304 Ill. App. 3d 791, 710 N.E.2d 72 (1999), where the defendant's physical condition or his manner of operating a vehicle

provided evidence to show that he was under the influence of alcohol to a degree that rendered him incapable of driving safely at the time of the accident. See also *People v. Zator*, 209 Ill. App. 3d 322, 568 N.E.2d 162 (1991).

Here, the State sought to introduce evidence regarding the blood-alcohol analyses performed by Lourdes Hospital and the Illinois State Police through the testimony of Cathy Anderson. According to the record, Anderson has a bachelor's degree in zoology from Southern Illinois University-Carbondale. She was taking graduate courses in chemistry and biology from the University of Illinois at the time of the trial. She completed the Illinois State Police toxicology training program and was certified to conduct alcohol- and drug-testing on biological samples. She was employed by the state police to test blood and other bodily fluids for the presence of alcohol and drugs.

According to the record, defendant's blood was drawn twice at Lourdes Hospital. Between 1:45 a.m. and 2 a.m., a phlebotomist drew two tubes of blood from defendant and delivered them to the hospital lab for a blood-alcohol analysis that had been ordered by the attending emergency room physician. The lab at Lourdes Hospital tests the blood serum rather than whole blood. Cathy Anderson testified that a serum result differs from a whole blood result. She explained that serum is the liquid part of the blood and that it will have a higher percentage of alcohol than whole blood. Over defendant's objection, Anderson testified that there is a formula which can be used to convert serum results to whole blood results. It is a formula that requires the serum blood result to be divided by a factor. There is a range of divisors that can be used in the conversion formula. The divisors range from 1.10 to 1.25. Over defendant's continuing objection, she divided the serum blood-alcohol level by the smallest divisor and the greatest divisor in the range and determined that defendant's whole-blood-alcohol reading for between 1:45 a.m. and 2 a.m. would have been between 0.088 and 0.077 grams per deciliter. During cross-examination, Anderson stated that the conversion factors (divisors) within the aforementioned range apply to most people. She acknowledged that some people fall outside the range and that the formula cannot be applied to all people or in all cases. She could not say whether the conversion range was applicable to defendant in this case.

Cathy Anderson was assigned to test the blood sample that had been secured by Trooper Hall. That sample had been drawn at approximately 3:30 a.m. Anderson testified that the Illinois State Police lab tests whole blood and that the blood-alcohol level in defendant's blood sample was 0.046 grams per deciliter. Over defendant's objection, Anderson was questioned about the rate at which people

metabolize alcohol. Anderson testified that there is an average rate at which most people metabolize alcohol, which has been published in literature. She was not asked to and did not identify the literature to which she referred. Over defendant's continuing objection, Anderson testified that the average rate of metabolism is 0.010 to 0.020 grams per deciliter per hour. A portion of the direct testimony is set forth verbatim.

"[Prosecutor:] What is the average rate that a person's body metabolizes alcohol?

MR. PATCHETT [defense counsel]: Objection, foundation.

THE COURT: Sustained.

Q. Do you know the rate a person—that the average person metabolizes alcohol?

A. I know a rate that I would give you that's been published in literature and a compilation of studies that have been done over the years. There's an average rate. It encompasses most people.

Q. And what is that rate?

MR. PATCHETT: I'm going to object still, Your Honor[;] this is the average rate that encompasses most people. There is no tie of this rate of eliminating alcohol to Bill Barham or the condition Bill Barham was in after that accident on the night in question. There's been no foundation laid that that rate would apply to Mr. Barham at all, or, in fact anybody else in the country other than an average person if you can find one.

THE COURT: If we were sitting with a jury, I would grant your objection. However, this Court understands what average is and who it applies to and who it doesn't. So I can consider all of that in arriving at a conclusion in this case.

MR. PATCHETT: I apologize for making my objection.

THE COURT: You don't have to apologize for making an objection."

During cross-examination, Anderson testified that there are several factors that can alter the metabolism rate, such as state of health, weight and height, and liver malfunctions. She could not state for certain whether trauma might affect metabolism. She also admitted that she did not know the rate at which defendant would have eliminated alcohol from his body at the time of the accident and could not say whether the average rate applied to defendant.

According to the record, Cathy Anderson was qualified to test blood samples for the presence of alcohol and other substances, to testify about the procedures used during those tests, and to testify to the results. See *People v. Krueger*, 99 Ill. App. 2d 431, 442, 241 N.E.2d 707, 712 (1968). But there is no evidence to indicate that Anderson was qualified to explain retrograde extrapolation or to render any

opinion regarding the rate of elimination of alcohol from the human system. The process and rate at which alcohol is eliminated from the body are complicated scientific matters that are beyond the skill, knowledge, and comprehension of the average person. See *Schneider v. Kirk*, 83 Ill. App. 2d 170, 181, 226 N.E.2d 655, 660 (1967). It is a complex scientific evaluation that is impacted by a number of variables. Expert testimony would be required initially to establish reliability and then its admissibility and relevance to this case.

The State did not show that Anderson was qualified by education, training, or experience to explain or render any opinion regarding the rate of elimination of alcohol in the human system. Anderson was never asked to and did not render opinions on the validity and reliability of the rate of elimination of alcohol from the human system or retrograde extrapolation. Anderson testified only that she was aware that the average rate of elimination was published in the literature. There is no evidence that she understood the process and how and to what extent other factors, such as overall health, weight, and trauma, might impact the rate at which alcohol is eliminated from the human system. Anderson was not asked to render an opinion on what population constituted "average" for purposes of this calculation. She did not know the rate at which defendant would eliminate alcohol on the date of the accident and could not express an opinion that he would be considered "average" for purposes of the elimination rate. According to this record, Anderson was not qualified to and did not render an opinion on defendant's blood-alcohol level at the time of the accident. The State did not present any other witness who was qualified to render an opinion that retroactive extrapolation is a generally accepted method in the appropriate scientific community, that it produces valid results, and that it could be applied to defendant in this case.

In its ruling, the trial court declared that it had all the facts it needed "to calculate a simple mathematical problem," and it determined that defendant's blood-alcohol level at the time of the accident was 0.081. In reaching its conclusion, the trial court determined that the accident occurred at 12 a.m., that the blood was drawn at 3:32 a.m., and that it would be appropriate to use 0.010 grams per deciliter as the rate of elimination. As previously shown, this calculation requires a consideration of factors beyond the time of the accident, the time the blood was drawn, and the blood-alcohol result. In this case, there was evidence that defendant was sick within days of the accident and that he sustained significant trauma in the accident. Yet, the trial court ignored factors such as defendant's overall health and the accident-related trauma in its calculation. Whether these factors

would have had any impact on defendant's elimination rate and to what extent are questions that were not answered. Such determinations required expert testimony. The trial court was not qualified to make such determinations in the absence of competent evidence in the record.

█ It has long been held that the deliberations of the trial judge are limited to the exhibits offered and admitted into evidence and the testimony and the record made before him or her in open court and that any private investigation by the court constitutes a denial of due process. *Rivers*, 410 Ill. at 416, 102 N.E.2d at 306. A trial court, sitting without a jury, has the obligation to weigh the evidence and make findings of fact and to act on principles that it would direct a jury to follow. *Rivers*, 410 Ill. at 419, 102 N.E.2d at 307; *In re Marriage of Douglas*, 195 Ill. App. 3d 1053, 1058, 552 N.E.2d 1346, 1350 (1990). Although it is presumed that the trial judge, in a bench trial, considers only competent evidence, this presumption may be rebutted where the record affirmatively shows the contrary. *Wallenberg*, 24 Ill. 2d at 354, 181 N.E.2d at 145.

█ In this case, the trial court recognized and admitted in open court that Anderson's testimony about the rate of elimination lacked foundation and would not have been admitted had this been a jury trial. It was error for the trial court, sitting as the finder of fact, to consider it. Moreover, the court's determination of defendant's blood-alcohol level at the time of the accident was based upon a calculation which the court was unqualified to make and which was untested by cross-examination or any of the rules of evidence. In effect, the trial court produced and proceeded to consider evidence that had not been introduced during the trial. Consequently, defendant had no opportunity to test or rebut this evidence. Due process requires that a criminal defendant have all the evidence against him considered in open court. See *Wallenberg*, 24 Ill. 2d at 354, 181 N.E.2d at 145.

In summary, the State offered no evidence that retrograde extrapolation was reliable and was applicable under the facts of this case. The court's calculation lacked a proper foundation and was not based on any degree of scientific certainty. It was nothing more than conjecture. See *Marshall v. Osborn*, 213 Ill. App. 3d 134, 142-43, 571 N.E.2d 492, 498-99 (1991). The trial court improperly assumed the role of expert witness and reached a conclusion that was based upon speculation and conjecture. The conclusion was immune from testing through cross-examination. The testimony regarding the rate of elimination of alcohol was inadmissible, and the court's conclusion was improper. We will not consider either as we evaluate the sufficiency of the evidence on count II.

According to the record, the trial court found that the result of the serum blood test was reliable and indicated that there had been alcohol in defendant's system at 2 a.m. The court did not consider the evidence because Anderson's testimony indicated that the conversion formula yielded an imprecise estimate that would not support a finding of intoxication beyond a reasonable doubt. For that reason and for the reasons discussed above, the conversion formula evidence was inadmissible and should not have been considered by the fact finder.

There is no question that defendant consumed alcohol, but the quantity was not established. A conviction for reckless homicide cannot be based solely on evidence that a defendant consumed an unknown quantity of alcohol. The fact that the paramedic and the trooper detected the odor of alcohol on defendant's breath is not evidence sufficient to prove that defendant was intoxicated on the night of the accident. There is no evidence that defendant's physical and mental abilities were impaired by alcohol at the time of the accident. Since there is no evidence to support a finding that defendant was under the influence of alcohol to a degree that rendered him incapable of driving safely and there was no other evidence of recklessness, defendant's conviction on count II of the indictment cannot be sustained. Although the guilty verdict on count IV of the indictment was vacated for other reasons, it is clear from the record that the evidence is likewise insufficient to prove defendant's guilt beyond a reasonable doubt on count IV and that conviction must also be reversed.

## CONCLUSION

This is a tragic case for all concerned. Based on the evidence in this record, we cannot determine whether defendant was under the influence of alcohol so as to impair his driving at the time of the accident, and neither could the trial court. The evidence in the record is insufficient to prove defendant guilty beyond a reasonable doubt. Given our disposition of the sufficiency-of-the-evidence issue, we need not consider the other allegations of error.

Accordingly, the judgment of the circuit court is reversed.

Reversed.

HOPKINS, P.J., and DONOVAN, J., concur.