2020 IL App (2d) 170633-U
No. 2-17-0633
Order filed March 27, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 16-DT-358 |
| | ) | |
| TYRONE DAVIS, | ) | Honorable |
| | ) | Robert J. Morrow, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Zenoff concurred in the judgment.

¶ 1     *Held*: The State presented sufficient evidence of defendant's guilt of driving while under the influence of alcohol and did not commit error when it elicited opinion testimony from responding officers.

¶ 2     Following a jury trial, defendant, Tyrone Davis, was convicted of driving under the influence of alcohol (DUI), 625 ILCS 5/11-501(a) (West 2014),[1] and sentenced to 18 months of

---

[1] Defendant was also found guilty of reckless driving, 625 ILCS 5/11-503(a) (West 2014). However, the trial court granted defendant's posttrial motion in arrest of judgment with respect to the reckless driving conviction.

court supervision. Defendant identifies two issues on appeal. The first is whether the State proved him guilty of DUI beyond a reasonable doubt. The second is whether the State committed plain error when it elicited opinion and scientific testimony from the testifying police officers. We hold that the court did not err and affirm.

¶ 3                                I. BACKGROUND

¶ 4      This case involves the bizarre sojourn of a small SUV to Clark Island, a series of three islands in the Fox River that are owned and operated by the Batavia Park District. The islands are connected to each other and to either side of the river by a series of pedestrian bridges, which are a part of a larger bike trail that runs alongside the river. The following facts are derived from evidence and testimony presented at defendant's jury trial.

¶ 5      On April 20, 2016, at approximately 2:07 a.m., Batavia police officers Brian Lorden and Eric Blowers were on routine patrol, speaking to each other in their respective squad cars in a parking lot north of Clark Island. At trial, Lorden testified that as he was speaking with Blowers, he noticed a vehicle's headlights proceeding north along the bike path toward the pedestrian bridges on the west bank of the river. Lorden indicated what he saw to Blowers, who confirmed that he saw a vehicle driving across one of the pedestrian bridges. The officers split up and drove to the only two points of entry to the islands: Lorden took the bridge on the western bank off Shumway Avenue; Blowers took the bridge on the eastern bank off River Street.

¶ 6      Lorden testified that as he drove toward Clark Island, he observed the vehicle drive over two pedestrian bridges and come to a halt near a pavilion on the centermost island. He parked near the Shumway Avenue bridge and began to walk toward the vehicle. As he approached the center island, he encountered a woman walking rapidly away from the vehicle. He later identified the woman as Jessica Wild. He testified that he saw the vehicle's headlights turn off and watched a

man (later identified as defendant) exit from the driver's door. Lorden informed defendant that the park was closed after dark and asked him what he was doing. Defendant responded: "what do you think I was doing?" At that time, Blowers arrived on scene and the four (Lorden, Blowers, Wild, and defendant) relocated to Shumway Avenue.

¶ 7　　Once there, Blowers spoke with Wild, and Lorden continued to speak with defendant. Defendant told Lorden that he was driving Wild home. Despite being instructed to keep his hands visible, defendant repeatedly placed his hands in his pockets, so Lorden conducted a pat-down on him. Lorden retrieved two sets of keys. When asked where the keys to the vehicle were, defendant stated he left the keys in the ignition. During this time, Lorden noticed a moderate smell of alcohol from defendant's breath and that defendant had red, bloodshot eyes. Lorden then asked defendant to complete standardized field sobriety tests (SFST).

¶ 8　　Lorden testified that he received training on the SFST and follows the guidelines presented by the National Highway Transportation Safety Administration (NHTSA) by reading the instructions for the SFST from a preprinted card. The area in which Lorden administered the SFST on Shumway Avenue was level, well-lit, and free of debris. Lorden testified that the first test he had defendant perform was the horizontal gaze nystagmus (HGN) test. The test contained six total clues, three in each eye. The following exchange occurred:

"Q. How many clues did you see in the defendant?

A. All six.

Q. How many clues at a minimum do you need to see in order to make a determination that an individual had consumed alcohol?

A. Four.

***

Q. What are the clues that you saw?

A. The clues would be lack of smooth pursuit for each eye. The second one is the onset at -- I am sorry. It would be the sustained and continuous nystagmus at maximum deviation and then the third one is nystagmus prior to 45 degrees.

\*\*\*

Q. What did the result of the that test show you as the officer?

A. That Mr. Davis had consumed alcohol that night."

Lorden explained that while he was performing the HGN test, defendant "continually turn[ed] his head back and forth to follow the stimulus," disregarding the instruction to only move his eyes. Lorden estimated that he instructed defendant eight to ten times to keep his head still.

¶ 9 Lorden then testified that he had defendant perform the walk and turn test. After reading the directions from the preprinted card, Lorden demonstrated the test to defendant. Lorden testified that there were a total of eight clues on the walk and turn test and that a minimum of two were needed to determine "whether or not an individual is impaired." Lorden noted that defendant exhibited three clues by the end of the test:

"One being him breaking that heel-to-toe stance during my instructions; two, lifting his arms up. And during the subsequent test when he was taking the nine heel-to-toe steps, he also intermittently would raise his arms for balance.

And then instead of -- on the turn instead of conducting small steps to create that turn, he spun on the ball of his foot and did a quick about-face coming back the other way."

¶ 10 Finally, Lorden asked defendant to perform the one-leg stand test. Lorden read the instructions from a preprinted card and demonstrated the test to defendant. Lorden testified that

there were a total of four clues on the one-leg stand test and that a minimum of two clues were needed to determine "whether or not an individual is impaired." Lorden noted three clues:

> "I noted that during the test he put his foot down, which is one of the clues. He held his arms up to maintain balance and the third clue was that he -- his torso, he swayed back and forth."

Lorden noted that defendant initially only had his foot about two inches off the ground, while the instructions required defendant to have his foot six inches from the ground. When prompted to raise his foot to six inches, defendant "became irate and started yelling" at the officers:

> "He started lifting his foot about waist high generally speaking and then back down to the ground, back up. And while doing that, he was waving his arms up and down and staring at myself and other officers, yelling, 'Is this good enough?' "

Lorden testified that he then placed defendant under arrest for DUI.

¶ 11    While in the squad car on the way to the precinct, defendant contested his arrest, stating that "he was only driving her home" and that "he couldn't be arrested because he wasn't stopped on the roadway." At the precinct, defendant refused to provide a breath sample, telling Lorden, "you blow in it." When he was informed that if he did not provide a sample within a specified time period, it would be deemed a refusal, defendant stated "fine, let it time out."

¶ 12    Lorden testified that throughout the encounter, defendant was inconsistent in his reasoning for being on the island and was "either vague or confrontational" in answering Lorden's questions. Lorden also testified that he had both personally and professionally witnessed thousands of individuals under the influence of alcohol. When asked if it was his opinion that defendant had been driving while under the influence of alcohol, Lorden responded yes. He based that opinion on defendant's

"driving on the bike path, off the bike path, poor decision-making, driving onto two bridges that are not safe for vehicle traffic, are dangerous to drive on, driving onto an island being park district property after close, his mood swings of being angry and hostile towards us, being uncooperative at times, the moderate odor of alcohol on his breath, the results of the field sobriety tests, his bloodshot, glassy eyes and his overall demeanor in booking as well."

Finally, Lorden opined that defendant was not fit to operate a motor vehicle for the same reasons he believed defendant was under the influence of alcohol.

¶ 13    On cross-examination, Lorden admitted that he never saw defendant actually driving the vehicle. He further admitted that his police report did not state that defendant exited from the driver's side of the vehicle, but rather that he "could see that [defendant] had emerged from the area of the parked vehicle and noted that the vehicle lights had turned off prior to exiting the vehicle." Lorden's report was also devoid of any mention of the steps Lorden took during the administration of the SFST, such as checking for pupil size and equal tracking during the HGN. During cross-examination, the following exchange occurred:

"Q. [Y]ou are trained in NHTSA which is National Highway Traffic Safety and Administration; is that right?

A.  Yes.

Q.  And as you administer those tests, there is several clues that you have to note?

A. Yes.

Q.  And based on those clues, you determined if someone has failed the test essentially?

A. It would show that they either consumed alcohol or given the test, that they were impaired, showed impairment."

Nowhere in his testimony did Lorden state that defendant "failed" any of the SFST.

¶ 14 Blowers testified that after he parked his car near the eastern entrance to the island, he walked toward the parked vehicle, using his flashlight to "survey[] the entire island, doing a cursory check of the island to make sure that there aren't other vehicles that could be a threat." He did not see anyone but Lorden, defendant, and Wild on the island. Once at the vehicle, he ran the license plate through dispatch and checked the interior of the vehicle with his flashlight. He did not see anyone else in the vehicle. While walking to Shumway Avenue, Blowers heard defendant state that Wild had "told him to drive across the bridges" and that "he didn't know he couldn't drive there."

¶ 15 Blowers intermittently observed portions of defendant performing the SFST, as he was providing "officer safety" and "dealing with" Wild. He noticed that Lorden had to repeatedly tell defendant to stop moving his head from side to side while performing the HGN test. He observed defendant say "I am not moving my head" while simultaneously moving his head. Blowers also testified that he observed defendant perform the one-leg stand test and observed defendant becoming "very agitated and raised his foot up to waist level, held it there for awhile, went down and up with his foot while waving his arms, you know, from between his waist and his head."

¶ 16 Blowers testified that he had seen thousands of individuals intoxicated both professionally and personally and had participated in roughly 150 DUI investigations. When asked, Blowers testified that he believed defendant was intoxicated on April 10 based on "his poor performance on the one-leg stand test, his inability to provide answers to some simple questions when we were

questioning him as to why he was on Clark Island" and "his inability to follow instructions during the [HGN] test." Based on those same factors, Blowers believed that defendant was not fit to drive.

¶ 17    On cross-examination, Blowers testified that although he did not administer or watch defendant performing the SFST the entire time, he was "still comfortable" in rendering his opinion that defendant was under the influence of alcohol. He also stated that he never observed defendant drive or exit the vehicle. Finally, Blowers admitted that in a previous hearing for the statutory summary suspension, he testified that he was there "primarily for officer safety purposes and didn't make any observations about [defendant's] sobriety at that time." On re-direct examination, the following exchange took place:

"Q. Was your opinion that this defendant was under the influence of alcohol, was that entirely based on your observations of what he did during those tests?

A. Yes."

¶ 18    A third officer, Chris Potthoff, also helped secure the scene. Potthoff testified that as the third "backup" officer "it was [his] job to walk around and make sure that there was nobody else, nothing else there that could surprise us or cause anybody harm." He did a sweep of the island and found no one. He then went to Shumway Avenue where defendant was performing the SFST. He identified that his role was primarily to ensure safety and crowd control. He watched defendant perform aspects of the tests and was particularly alerted to defendant's movements on the one-leg stand test because "he raised [his leg] all the way up to waist and had his hands waving up really high which *** in my role drew my attention because it's a lot easier to, you know, move or swing your arms in an offensive manner at that point ***. I was definitely paying very close attention to him then."

¶ 19    After defendant was arrested and transported to the station, Potthoff drove the vehicle off the island because a tow truck would not be able to fit across the pedestrian bridges. Potthoff testified that the vehicle smelled strongly like burnt cannabis, and he performed a search of the vehicle before it was towed. While documenting the vehicle's contents, Potthoff found a partially smoked cannabis cigarette under the driver's seat and a plastic cup with a clear liquid that smelled like alcohol in the cupholder. When defendant was informed that the vehicle was towed, he got "really upset" and stated that it was his girlfriend's car. "[H]e just kept going on about that, about taking his girlfriend's car, trouble he was going to be in, stuff like that."

¶ 20    When asked, Potthoff stated that he formed the opinion that defendant was under the influence of alcohol and was unfit to drive. His opinion "[f]ormed initially when [he] was watching [defendant] perform the field sobriety tests. His lack of ability to maintain his balance, swinging his arms, the inability to follow commands, not just answer questions but follow commands given by Officer Lorden, that was the primary basis for my determination."

¶ 21    On cross-examination, Potthoff testified that he never saw defendant drive or exit the vehicle, and that his police report was devoid of any mention of him doing a walk around on the island. Potthoff also testified that there were cameras, camera equipment, and an amplifier in the back of the car.

¶ 22    The State also called Jessica Wild to testify. Wild testified that on April 9 she went to a few bars in Batavia and consumed "a lot" of alcohol, specifically Wild noted that she had "a couple beers" and a mixed drink. About 2:00 a.m. on April 10, she left a bar with a "tall black man." She had never met the man before but got in a vehicle with him to smoke marijuana. Because her memory was foggy, she was only 75% sure that the man she left with was defendant, but identified that he had similar characteristics of the man she left with. Wild "believed" that defendant was in

the driver's seat of the vehicle. She was in the passenger seat and did not remember anyone else in the vehicle.

¶ 23    Wild suggested that the two go to a nearby quarry to smoke, but instead of driving toward the quarry, defendant drove "through a parking lot and then onto the bike path and then *** over the bridges to the island in Batavia." She felt scared when defendant was driving on the bike path because it was "[a] place that we shouldn't be driving." Once defendant stopped the car on the centermost island, Wild became "more scared." Wild exited the vehicle and walked rapidly away from the car. She then ran into a police officer on one of the bridges. While on the island, she did not see any other civilian aside from defendant.

¶ 24    On cross-examination, Wild admitted that she was "very drunk" on April 10 and she did not witness the man she left with consume any alcohol. She also admitted that she was not 100% sure that defendant was the driver of the vehicle. While she did not see any other civilian on the island, "there was a chance" that there could have been another person in the vehicle. When asked on redirect examination whether it was only her and defendant in the car, she testified "Honestly, I was very drunk. As far as I recall it was just the two of us. Could there have been someone else in the vehicle? I really cannot say."

¶ 25    After the State rested, defendant moved for a directed finding. The trial court denied defendant's motion, noting "[i]n the light most favorable to the state I am denying the defense motion. We also have the opinion of three officers who testified that he was under the influence of alcohol in addition to the things the state mentioned." The defense began its case with its only witness to testify, a woman named K.C. Phongsavath.

¶ 26    Phongsavath testified that around 1:00 a.m. on April 10, 2016, defendant asked her to drive him to a video shoot for one of his clients. Defendant has a photography/videography business.

Phongsavath testified that she had a larger car that made transporting his camera equipment easier. She picked him up from a home in Aurora and drove to an address in Batavia that defendant had plugged into his GPS. She had never been to Batavia before and simply followed the GPS's instructions toward the island. When she got there, she drove over a bridge and parked the car on some grass near the paved surface she was on. Defendant then exited the vehicle, grabbed some of the camera equipment from the back, and "walked off." Phongsavath testified that defendant came back to the car and dropped off the equipment before walking away again. Phongsavath saw an individual approach defendant but then lost sight of them. She sat in the car "for a little bit" and then exited the vehicle. She had never seen defendant under the influence of alcohol but did not believe that he was under the influence of alcohol that evening.

¶ 27    Upon cross-examination, Phongsavath's testimony began to unravel and she often repeated the State's questions to "reassure" herself. Phongsavath testified that she recalled only driving on roads, never on a bike path, she did not find it unusual that the bridge she was directed to drive over just barely fit her car, and she was not defendant's girlfriend. She clarified that she picked up defendant at about 1:15 a.m. in Aurora and immediately drove to the island. She recalled only going over one bridge to the island. She saw no one else but defendant on the island, and no one but her and defendant were in the vehicle. She had never met or knew of Jessica Wild. She was parked for about one minute before defendant got out of the car and walked off. He was outside for about five minutes when defendant walked off with the individual. She waited in the car for a bit before getting out of her car to "get a better view of what was going on." When she could not see defendant she began "panicking and kind of pacing and walking *** around [her] car." While she was outside of her vehicle, nobody approached her, and she did not see any officer approach her vehicle.

¶ 28    She then left the island and called someone to come pick her up. She walked the same direction she entered the island from, over a bridge and toward "a couple of buildings." When asked what type of buildings they were (i.e. sheds, police stations, churches, etc.), she could not remember. When asked if she saw multiple police cars parked and officers speaking with defendant, she stated "Well, I just seen -- briefly seen. I didn't -- I wasn't paying attention or looking thoroughly of how many there were or -- you know, I was just trying to figure out for myself." Despite seeing defendant with the officers, she did not stop because she was scared.

¶ 29    After hearing argument from the State and defense, the jury deliberated for a little over three hours before finding defendant guilty of DUI. Defendant was sentenced to 18 months of court supervision. After several posttrial motions, defendant filed his notice of appeal on August 9, 2017.

¶ 30                                  II. ANALYSIS

¶ 31    We start by considering whether the State proved defendant guilty beyond reasonable doubt. When a challenge to the sufficiency of the evidence is presented, the relevant question is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond reasonable doubt. *People v. Torruella*, 2015 IL App (2d) 141001, ¶ 39. All reasonable inferences must be allowed in favor of the State. *People v. Lloyd*, 2013 IL 113510, ¶ 42. We will only reverse a conviction if the evidence is so improbable, unsatisfactory, or inconclusive that it raises a reasonable doubt about the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004). On appeal, we do not retry the defendant or substitute our judgment for that of the jury, as "[i]t is the province of the jury to weigh the evidence, assess the witnesses' credibility, resolve any conflict in the evidence, and draw

reasonable inferences and conclusions from the evidence." *People v. Tatera*, 2018 IL App (2d) 160207, ¶ 23.

¶ 32   To sustain a conviction of DUI, the State must prove that a defendant was driving or in actual physical control of a car while he was under the influence of alcohol. 625 ILCS 5/11-501(a)(2) (West 2014); *People v. Phillips*, 2015 IL App (1st) 131147, ¶ 17. Defendant contests the sufficiency of the evidence to both elements: (1) that he was driving or in actual physical control of the vehicle and (2) that he was under the influence of alcohol. We discuss each element in turn.

¶ 33   The issue of actual physical control of a vehicle is determined on a case-by-case basis, giving consideration to whether the defendant (1) possessed the ignition key, (2) had the physical capability to operate the vehicle, (3) was sitting in the driver's seat, and (4) was alone with the doors locked. *People v. Morris*, 2014 IL App (1st) 130512, ¶17. These factors serve as guidelines; the list is neither exhaustive nor is the absence of one individual factor controlling. *Id.*

¶ 34   Defendant argues that reasonable doubt existed as to whether he was the driver because none of the officers saw him driving, Wild testified that her memory of the driver was "foggy" due to her alcohol consumption, and Phongsavath testified that she drove the vehicle onto the island. We are unpersuaded by that assertion. Lorden testified that he observed the vehicle driving on a bike path and over two pedestrian bridges to the centermost island and watched defendant exit the vehicle from the driver's side door shortly after the headlights of the vehicle turned off. Lorden's testimony was corroborated by Wild's admittedly "foggy" memory of the events of April 10. She was in the passenger seat, did not recall any other individual in the vehicle, and was 75% sure that defendant was the man in the driver's seat. Additionally, defendant admitted that he left the keys to the vehicle in the ignition, he was "only driving her home," and asserted that he could not be arrested for DUI because he was not on a roadway.

¶ 35    Although it is true that none of the testifying officers actually saw defendant driving the vehicle due to the distance and darkness, the circumstantial evidence, when viewed collectively, allows for the conclusion that defendant drove the vehicle onto the island. Although Phongsavath testified that she drove onto the island, the jury was not bound to accept defendant's contention that she was the driver. See *People v. Hostetter*, 384 Ill. App. 3d 700, 711 (2008) ("The trier of fact determines the credibility of the witnesses, the weight to be given to their testimony, and the inferences to be drawn therefrom."). Thus, there was sufficient evidence to establish defendant had actual control over the vehicle.

¶ 36    To be "under the influence of alcohol," a defendant must be under the influence to a degree that renders him incapable of driving safely. *Phillips*, 2015 IL App (1st) 131147, ¶ 18. Intoxication is a question of fact that may be proved in numerous ways, such as through testimony that a defendant's breath smelled of alcohol and that his eyes were glassy and bloodshot. *People v. Love*, 2013 IL App (3d) 120113, ¶35. The testimony of a single, credible officer alone may sustain a conviction of DUI. *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 24.

¶ 37    Defendant argues that the analysis used in *People v. Barham*, 337 Ill. App. 3d 1121 (2003), is instructive here. The court in *Barham* reversed the defendant's conviction of reckless homicide in part because there was no evidence establishing that defendant was driving erratically, weaving through traffic, or was unable to maintain his vehicle in his lane of traffic prior to the deadly accident. 337 Ill. App. 3d at 1131. There was also no evidence that defendant had bloodshot, glassy eyes, slurred speech, exhibited erratic behavior, or other similar characteristics of intoxication. *Id.* Because the only evidence was that defendant consumed an unknown quantity of alcohol hours before and there was no evidence demonstrating that defendant's physical and mental abilities were impaired by that alcohol at the time of the accident, the court reversed. *Id.* Defendant

maintains that like the defendant in *Barham*, there was no evidence that he was driving erratically, speeding excessively, or not within his lane of traffic. Thus, he maintains, there was insufficient evidence to prove that he was driving in an unsafe manner. We disagree.

¶ 38 Contrary to defendant's argument, there was evidence presented of his unsafe driving. Specifically, two officers observed the vehicle driving on a bike path and over two pedestrian bridges to reach an island otherwise inaccessible to motorized vehicles. Also, unlike the defendant in *Barham*, there was evidence that defendant had glassy, bloodshot eyes, a moderate smell of alcohol on his breath, and acted in an erratic manner by becoming irate, kicking his leg up and down and waving his arms about while performing the one-leg stand test. Defendant was also inconsistent with his answers to the officers and had to be instructed multiple times to keep his head still while performing the HGN test. Although it is true that defendant had no trouble with his speech or walking on his own, the State did not need to prove defendant was completely incapacitated by alcohol, but merely demonstrate defendant was impaired by alcohol to the extent that it rendered him incapable of driving safely. *Phillips*, 2015 IL App (1st) 131147, ¶20.

¶ 39 Any weaknesses in the State's case derived from Phongsavath's testimony do not move us to conclude that the evidence of his guilt was so unreasonable, improbable or unsatisfactory as to justify reasonable doubt of his guilt. See *People v. Brown*, 2013 IL 114196, ¶ 48. Thus, we cannot say that the State failed to prove him guilty beyond a reasonable doubt of DUI.

¶ 40 We next attend to defendant's second contention, that the State elicited inappropriate opinion and expert testimony as to whether he was under the influence of alcohol from Lorden, Blowers, and Potthoff. Defendant concedes that he failed to object to the testimony or preserve this issue in his posttrial motions. Thus, absent plain error, defendant has forfeited review of this issue on appeal. Defendant urges us to review the issue for plain error.

¶ 41    The plain error doctrine allows reviewing courts to consider an unpreserved issue if either (1) the evidence is closely balanced or (2) the error is so substantial that it affected the fairness of the proceeding, and remedying the error is necessary to preserve the integrity of the judicial process. *Hostetter*, 384 Ill. App. 3d at 707. Under both prongs, the burden of persuasion rests with the defendant. *People v. Sargent*, 239 Ill. 2d 166, 189-190 (2010). However, in order to trigger plain-error analysis, we must first determine whether an error occurred, which requires a substantive examination of defendant's claims. *People v. Naylor*, 299 Ill. 2d 584, 593 (2008). For the following reasons, we conclude because there was no error, there can be no plain error. *People v. Johnson*, 218 Ill. 2d 125, 139 (2005).

¶ 42    Defendant initially argues that each of the officers' opinions as to whether defendant was intoxicated and incapable of driving a car safely were in violation of Illinois Rule of Evidence 701. Ill. R. Evid. 701 (eff. Jan. 1, 2011). Rule 701 governs opinion testimony by lay witnesses and requires that those opinions be "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge." *Id.* Defendant argues that the officers' opinions of whether he was intoxicated and incapable of operating a vehicle safely were inadmissible because they failed to satisfy the requirements in Rule 701. Specifically, defendant identifies that none of the officers witnessed defendant driving and their opinions were not helpful to the jury because the jury was in just as good a position to judge whether defendant was intoxicated and able to drive safely from the evidence presented.

¶ 43    Defendant's argument fails for multiple reasons. It ignores Lorden's testimony that he saw defendant exit the vehicle from the driver's side immediately after the headlights turned off and, more importantly, that defendant admitted to driving the vehicle. The officers' opinions were, in

part, based on their perception of defendant when they began to interact with defendant, including the smell of alcohol on his breath and his erratic behavior. It is true that the officers' opinions on defendant's driving were not gathered from witnessing defendant weaving through traffic or speeding excessively as is the case in many DUIs, but it is axiomatic that driving on a bike path and over pedestrian bridges at 2:00 in the morning is unsafe. Further, while we agree that the jury was able to determine whether defendant was intoxicated and able to drive a vehicle safely, that does not mean that officers cannot also give their opinion. See *People v. Martin*, 2017 IL App (4th) 150021, ¶ 22 (finding an officer's opinion of whether a defendant accused of DUI was driving the car was admissible because the trier of fact is not required to accept the officer's conclusion); see also Ill. R. Evid. 704 (eff. Jan. 1, 2011) ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). Thus, there was no error in the officers' opining as to whether defendant was under the influence of alcohol and driving unsafely on April 10.

¶ 44    Defendant also argues that Lorden's testimony regarding his performance on the SFST was in violation of Rule 701(c) because Lorden testified that defendant "failed" the tests based on the number of "clues" he counted. Defendant maintains that Lorden's use of the terms "fail" and "clues" presented a misleading aura of scientific certainty that was unfairly prejudicial. We are unpersuaded by his argument.

¶ 45    Relying on *People v. McKown*, 236 Ill. 2d 278 (2010) and *People v. Floyd*, 2014 IL App (2d) 120507, defendant first "challenges the notion that the reviewing court may consider scientific or technical evidence regarding the number of clues necessary to find that a particular test has been failed." Defendant misstates the record in making this argument. Lorden never testified that defendant "failed" any of the SFST. When asked, during cross-examination by defendant's

counsel, "[a]nd based on those clues, you determine if someone has failed the test essentially?" Lorden responded, "[i]t would show that they either consumed alcohol or *** that they were impaired, showed impairment." Contrary to defendant's assertion, Lorden's response to the question was in line with the holding in *McKown*. 236 Ill. 2d at 306 (holding that with the proper foundation, an officer may use the HGN results as a part of the basis for his opinion that the defendant was under the influence and impaired).

¶ 46 Defendant next argues that Lorden's use of the word "clue" was unfairly prejudicial and urges us to follow the analysis employed in *United States v. Horn*, 185 F. Supp. 2d 530 (D. Md. 2002). We decline to do so. In *Horn*, the court conducted a *Daubert* analysis regarding the use of SFST in a DUI trial. The court determined that the prosecution could not elicit testimony from an arresting officer regarding the defendant's "passing" or "failing" of the "test" based on "standardized clues" because the prosecution had not shown that the conclusions were "based on sufficient facts or data and [were] derived from reliable methods or principles." *Horn*, 185 F. Supp. 2d at 561. In contrast with *Horn*, Illinois courts have recognized an officer's ability to testify to SFST under the applicable *Frye* standard (see *e.g.*, *McKown*, 236 Ill. 2d 278) and, more importantly, that an officer may testify as to a driver's intoxication based on the results of non-scientific sobriety tests, such as the one-leg stand or walk and turn tests (*e.g.*, *People v. Bostelman*, 325 Ill. App. 3d 22, 32-3 (2001)).

¶ 47 Assuming, *arguendo*, that it was error for the officers' opinion as to defendant's intoxication or Lorden's explanation of the "clues" he noted while administering the SFST to be admitted into evidence, our review of the record shows the evidence in this case was not closely balanced. Lorden and Blowers observed a vehicle driving on a bike path and over two pedestrian bridges to Clark Island. Lorden observed defendant exit the vehicle from the driver's side

immediately after the vehicle's headlights turned off. Defendant admitted that he was driving and had left the keys in the ignition. Lorden detected a moderate smell of alcohol on defendant's breath and noticed that defendant's eyes were red and bloodshot. Potthoff discovered a cup in the vehicle which had a clear liquid that smelled like alcohol. Defendant's answers to the officers' questions as to why he was on the island were inconsistent, and he was "either vague or confrontational" with the officers. He had to be instructed several times to follow the directions to the HGN test, even stating "I'm not moving my head" while moving his head. Defendant became irate with the officers and flailed his arms and legs about during the one-leg stand test. Finally, defendant refused to provide a breath sample, which may be viewed by the jury as consciousness of guilt. *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶26. Given the totality of the evidence against defendant, we cannot say that it was closely balanced as to be prejudicial. See *People v. Janik*, 127 Ill. 2d 390, 402-3 (1989) (holding that an arresting officer's testimony about the odor of alcohol, defendant's watery eyes, and defendant's poor performance on the field-sobriety tests was sufficient evidence of intoxication).

¶ 48    Because we do not find any error was committed, we do not find plain error. As a result, defendant's argument is forfeited.

¶ 49                                III. CONCLUSION

¶ 50    For the reasons stated, we affirm.

¶ 51    Affirmed.